## CITY OF TEMPLE v. MITCHELL.
### No. 9426.

Court of Civil Appeals of Texas. Austin.
May 3, 1944.

John B. Daniel, Jr., of Temple, and Lewis Jeffrey, of Fort Worth, for appellant.

Arthur O'Connor, of Belton, for appellee.

McCLENDON, Chief Justice.

Suit by Mitchell against the City of Temple for damages allegedly resulting from the operation by the City of a sewage disposal plant, located some 2½ miles S. E. of the City and 2,700 feet S. E. of Mitchell's 30-acre farm home. The plant was alleged to constitute a nuisance in that it produced offensive odors and bred sewer flies which invaded the Mitchell home and rendered living conditions therein intolerable. The damages sought were: As for a permanent nuisance, 1) depreciation in value of the farm, and "discomfort, annoyance and inconvenience" 2) to his wife and 3) to himself; and, in the alternative, as for a temporary nuisance, 1) depreciation in rental value of his farm and items 2 and 3 above. The trial was to the court and the judgment was in favor of the City upon the issue of permanent nuisance and in favor of Mitchell upon that of temporary nuisance. The damages were assessed at $1,097.90, itemized as follows: Those suffered by Mrs. Mitchell $500, by Mr.

Mitchell $400, and depreciation in rental value of the farm $197.90, based upon $60 per annum ($5 per month) from the date the plant was put in operation (May 17, 1940) to the date of judgment (September 4, 1943).

There had been a previous injunction suit by Mitchell and others in which a temporary injunction was denied. Mitchell v. Temple, Tex.Civ.App., 152 S.W.2d 1116, error ref. W. M.

The City has appealed and has briefed 12 points presented under six headings. These urge in substance the following propositions:

1. The damages sought were consequential only, and since the plant and its operation constituted a lawful and necessary business, and no unlawful, unreasonable, unnecessary, or negligent conduct or use was alleged or proven, no right of action was shown. Points 1 to 8, inclusive, and Point 10.

2. The City was engaged in "a governmental function, for torts and damages resulting from which it was not liable." Point 12.

3. For a like reason damages for personal inconvenience and annoyance were not recoverable. Point 9.

4. Neither pleading nor proof supported an action for temporary nuisance; therefore the only measure of recovery was depreciation in value of the land. Point 11.

Before considering these propositions in detail we make this general statement: The record shows conclusively that the City had the charter power to locate and operate the plant and in so doing was performing a governmental function. See Gotcher v. Farmersville, 137 Tex. 12, 151 S.W.2d 565. The plant was erected on an 80-acre tract owned by the City, and its location was shown to be probably the best practical one available. The plant was permanent in character, erected at a cost of about $100,000, and was of a modern design approved by the State Health authorities. No issue is raised in these regards. Excluding the issue of negligent operation (a subject later discussed) the City was guilty of no wrong (tort) in locating or operating the plant, and since nuisance is in law essentially a tort, nuisance either per se or per accidens was not alleged or proven. The suit was maintainable therefore only upon the theory that the plant

in its location and operation constituted a damaging of Mitchell's property for a public use, Tex.Const. Art. 1, § 17, Vernon's Ann.St.; and since, as we hold, the facts alleged were sufficient to support recovery upon that theory, it is not material that they were characterized in the pleadings and in the trial court's findings as a nuisance.

■ The first proposition is predicated upon a correct general principle of law. For general treatment of the subject see A. L. I. Restatement of Torts, Vol. 4, pp. 214 et seq., Chap. 40. The issue here turns upon the question whether the use to which the City's property was devoted was a reasonable one, or, as sometimes expressed synonymously, a justifiable one. This issue does not depend upon whether the use constituted an *abatable* nuisance; which embraces other questions not here involved. See Rainey v. Red River T. & S. R. Co., 99 Tex. 276, 89 S.W. 768, 3 L.R.A.,N.S., 590, 122 Am.St.Rep. 622, 13 Ann.Cas. 580. Nor is the fact that the business is a lawful one controlling, since damage from unreasonable though lawful use is actionable. The situations to which the rule is applied are numerous and varied, as are the adjudicated cases thereon. For our present purposes an extended review of the authorities would not be warranted. We shall only consider the case of Gulf, Colorado & Santa Fe R. Co. v. Oakes, 94 Tex. 155, 58 S.W. 999, 52 L.R.A. 293, 86 Am. St.Rep. 835 (opinion by Associate Justice Williams), which is probably the leading case in this State upon this subject. There damages were sought against the railroad for sodding its embankment with Bermuda grass, which spread from the right of way to plaintiff's land. The court refused to follow the doctrine of absolute liability laid down in the celebrated English case of Fletcher v. Rylands, L.R., 1 Exch. 263; and predicated non-liability upon the non-existence of justifiableness (reasonableness) in the particular act complained of; holding that: "Since the planting of the grass was not in itself unlawful and is not shown to have been done under circumstances to make it an unjustifiable use by appellant, we conclude that it is not shown to be liable for the damage of which appellee complains."

In the course of the opinion it is said:

"It may be conceded that if a mischievous grass, not naturally growing upon land but brought there by its owner, would inevitably so spread upon adjoining farms as to destroy their capacity to produce any other crops, the introduction of it would be an unreasonable use of his land by such owner, because it would force others to forego all other uses of their property. And so it might be under other circumstances less extreme than those supposed. But it is obvious that to establish a liability of this sort, the evidence must show the facts necessary to give rise to it."

■ The rule implicit in these quotations that to constitute a nuisance the lawful serviceable use of one's property must be unreasonable is quite generally accepted. As stated, we are not concerned here with its various applications, but only with the more restricted issue of pollution of the air and breeding of flies which are carried by the winds to adjacent property. Upon the subject of pollution of the air the general rule is thus stated in 39 Am.Jur., pp. 335, 336, § 53:

"Every person has the right to have the air diffused over his premises, whether located in the city or country, in its natural state and free from artificial impurities. However, by air in its natural state and free from artificial impurities is meant pure air consistent with the locality and character of the community. The pollution of the air so far as is reasonably necessary to the enjoyment of life and indispensable to the progress of society is not actionable. But this right of pollution must not be exercised in an unreasonable manner so as to inflict injury upon another unnecessarily; and any business, although in itself lawful, which necessarily impregnates large volumes of the atmosphere with disagreeable, unwholesome, or offensive matter, may become a nuisance to those occupying adjacent property, in case it is so near, and the atmosphere is contaminated to such an extent, as substantially to impair the comfort or enjoyment of adjacent occupants. Thus, smoke, dust, noxious fumes or gases, or stenches or smells, may constitute a nuisance under some circumstances."

From the same authority, p. 341, § 59, under the heading "Stenches and Smells," we quote:

"A reasonable use of one's property can never be construed to include those uses which produce noxious smells and result in a material injury to the comfort of the owner of adjacent property and his family. Thus, a business, although in itself lawful,

which impregnates the atmosphere with disagreeable or offensive odors or stenches may become a nuisance to those occupying adjacent property, in case it is so near, and the atmosphere is contaminated to such an extent, as substantially to impair the comfort or enjoyment of such adjacent occupants."

In order to constitute a nuisance, however, the invasion of one's property rights must be substantial. In this connection the following is from the A. L. I. Restatement of Torts, Vol. 4, pp. 229, 230:

"By substantial invasion is meant an invasion that involves more than slight inconvenience or petty annoyance. The law does not concern itself with trifles, and therefore there must be a real and appreciable interference with the present usability of a person's land before he can have a cause of action under the rule here stated. When an invasion involves a detrimental change in the physical condition of the land, there is seldom any doubt as to the substantiality of the invasion. Where, however, the invasion involves only personal discomfort or annoyance, it is sometimes difficult to determine whether the invasion is substantial. The standard for determining the substantiality of such invasions is the standard of normal persons in the particular locality. If normal persons living in the locality would regard the particular situation as definitely offensive or annoying, then the invasion is substantial. If normal persons in that locality would not be definitely annoyed or disturbed by the situation, then the invasion is not substantial even though the idiosyncrasies of the particular plaintiff make it unbearable to him. Rights and privileges in respect to the use and enjoyment of land are based on the general standards of normal persons in the community and not on the standards of the individuals who happen to be using or occupying particular parcels of land at a particular time."

The evidence was widely conflicting with reference to the degree and character of the odors, the extent to which sewer flies were bred, and the distance to which the odors and the flies to an appreciable extent could be carried by ordinary winds. It was sufficient, however, to support a finding that continuously from the beginning of operation of the plant to the date of trial, in all seasons of the year, whenever the breeze was from the southeast (the prevailing direction during most of the year) odors and flies were carried from the plant to the Mitchell residence, that these odors were very offensive and nauseating to persons of ordinary sensibilities, and the flies were in large numbers, and that as a consequence the use of the farm as a home and consequently its value as such was substantially impaired. Several witnesses testified to the consequent depreciation in value, variously estimating it from $500 to $1,500. Mitchell bought the farm in 1928, and he and his wife had occupied it as their home ever since. The plant was located in a section of the county devoted to agriculture, in which the small farm predominated. These facts were sufficient, prima facie, to establish a private nuisance, had the plant been operated as a private enterprise.

Upon the second proposition, it is now firmly established in this State that where land is injured by the establishment and maintenance of public works, under circumstances which, if done in private enterprise, would constitute an actionable wrong, recovery may be had under the above Art. 1, § 17 of our Constitution providing that "no person's property shall be * * * damaged * * * for * * * public use without adequate compensation being made, except by the consent of such person." See Rainey v. Red River T. & S. R. Co., 99 Tex. 276, 89 S.W. 768, 3 L.R.A., N.S., 590, 122 Am.St.Rep. 622, 13 Ann.Cas. 580; City of Amarillo v. Ware, 120 Tex. 456, 40 S.W.2d 57; Gotcher v. Farmersville, 137 Tex. 12, 151 S.W.2d 565; Hart Bros. v. Dallas County, Tex.Com.App., 279 S.W. 1111; State v. Hale, Tex.Civ.App., 96 S.W.2d 135 (affirmed on this point 136 Tex. 39, 146 S.W.2d 731); Pieratt v. La-Grande, Tex.Civ.App., 171 S.W.2d 377 (reversed on another ground, Tex.Sup., 175 S.W.2d 243). A leading case on this subject (a garbage incinerator case) is Jacobs v. Seattle, 93 Wash. 171, 160 P. 299, 302, L.R.A.1917B, p. 329. In that case the city erected the incinerator under express statutory authority, and there was also a code provision that: "Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance." 3 Rem. & Bal.Code Wash. § 8311. The state had a constitutional provision similar to our Art. 1, § 17. After a careful review of the authorities, the court held:

"From the foregoing authorities it is clear that the erection and maintenance by a city of an incinerator for the burning

of garbage on land adjacent to that of a private owner, and its operation so as to depreciate the value of his land and render it a menace to the health of himself and family, constitute a damaging of private property for a public use for which he would be entitled to compensation under the terms of Const. art. 1, § 16."

The subject is treated in 38 Am.Jur., p. 357, § 648.

■ We sustain the third proposition upon the authority of Rainey v. Red River T. & S. R. Co., above; St. Louis, S. F. & T. R. Co. v. Shaw, 99 Tex. 559, 92 S.W. 30, 6 L.R.A.,N.S., 245, 122 Am.St.Rep. 663, and Grossman v. Houston, O. L. & M. P. R. Co., 94 Tex. 641, 92 S.W. 836. It was not shown or contended that there was any abuse of the discretion vested in the City in the location, design or construction of the plant. To quote from Mitchell's brief:

"The plaintiff has no complaint against the City of Temple as to the manner of construction of its sewage disposal plant nor to the letting of the contract for its erection, nor for the designing of same, and would have no complaint as to its operation and location if it were so operated as not to emanate vapors and sewage flies that are so materially offensive to plaintiff as to cause the damages complained of in plaintiff's petition."

For its operation in the ordinary manner, therefore, the only damages recoverable against the City were those which affected the value of land. Personal inconvenience and annoyance to occupants of the land were elements which might affect its value for the uses to which it was appropriately adapted and put; and as such evidence thereof was relevant. But apart from their involvement in the issue of injuries to land, they did not constitute recoverable elements of damage.

■ Passing to the fourth proposition, which we also sustain, we will first consider the issue of negligent operation of the plant. The City contends it is not liable therefor under the rule laid down in personal injury cases that a city is not liable in the performance of a governmental function, for the torts of its agents and employees; citing City of Wichita Falls v. Robinson, 121 Tex. 133, 46 S.W.2d 965; City of Dallas v. Smith, 130 Tex. 225, 107 S.W.2d 872; Gotcher v. Farmersville, above, and other cases of like import. The invoked rule derives from that to the ef-fect that the doctrine of respondeat superior is not applicable to sovereignty. See Gotcher v. State, Tex.Civ.App., 106 S.W. 2d 1104, and authorities there cited. In the above case of Dallas v. Smith, this rule was applied in a suit for damages for the death of a child through negligence of a physician employed by the city to operate a hospital. The rule was held to apply even though the city was negligent in employing and putting in charge of the hospital a physician who "was not fully qualified and capable of treatment of emergency patients." We see no controlling distinction between a hospital and sewage disposal plant in these regards; each being a governmental function and operated in the interest of public health.

The only evidence which under any theory might be construed as constituting negligent operation related to the following items in the process:

The sewage gas was used as fuel in heating and operating the plant, the surplus being burned in an apparatus for that purpose, an appliance of which was a pilot light to insure constant burning. When there was no surplus gas the pilot light would go out and require relighting. This was done as soon as discovered by the operator in charge. Occasionally it happened that some surplus gas escaped before discovery that the pilot light was out. On two occasions the burner to the pilot light burned off and a new burner was required. It took some two weeks to get a new burner the first time and four weeks had elapsed the second time up to the time of trial. The delay in each instance was on account of war priorities. As we understand the record, the pilot light was not essential to burning the gas, but only to relight it when it ceased to burn on account of low pressure. Relighting was accomplished in the same manner as when the pilot light was in order but not burning. The evidence was that odors, in so far as they were from gas, were stronger when it escaped without burning.

Another source of odors was in the operation of disposal of "sludge", the residue from solids in the sewage after treatment destroying all organic matter. Disposal was by spreading it on a field and plowing it under when sufficiently dry for that purpose. The evidence showed that weather conditions determined the length of time required for the necessary drying. There was evidence that on one occasion there

was a healthy growth of weeds, tomatoes, and melons along the border of the sludge field.

The other item, which only involved flies, related to the "filter". Several witnesses testified to seeing some sewer flies or larvae in the filter; and a report of the State Health Department in November 1941 was to the effect (we quote from Mitchell's brief) that "there is an observance that a large number of filter flies and larvae were covering the filter rock and wall and in order to remove this the filter is flooded once in awhile, whenever the operator thinks it necessary." There was evidence that this condition could be largely eliminated or reduced by flooding.

We have carefully read the entire 554-page statement of facts and believe the above is a fair statement of the effect of the evidence upon the issue of negligent operation. It is not necessary to detail it.

As to the surplus gas burner and sludge disposal we think the evidence does not support negligent operation, but that the occurrences in evidence were incident to the ordinary operation of the plant, for the deleterious results of which the City's liability would depend upon the application of the above rules, independently of any issue of negligence. The evidence was sufficient we think to support a finding of negligence to some extent, at least, in regard to the filter. We hold the City's liability for injuries in this as well as in the other above regards is not dependent upon the existence vel non of negligence, for reason given below.

As already stated, negligent operation was not plead, and there was no finding thereof by the trial court. The injuries for which recovery was awarded were predicated both upon odors and flies. The findings of the trial court thereon were: As to the former, "That since the operation of said * * * plant * * * vile and disagreeable odors have emanated therefrom"; as to the latter, "That since the operation of said * * * plant it has at times been a breeding place of flies, commonly known as a sewage fly." It is manifest from these findings that the court took the view that the odors were continuous from the beginning of operations, and that the injuries resulting to Mitchell therefrom occurred whenever wind and weather conditions favored. This view is corroborated by the finding of a continuous damage in reduced rental value of the property at $5 per month, during the entire period of operation to the time of trial.

Negligent operation we regard as entirely eliminated from the case. The City plead that the plant was a permanent improvement, "that it proposes to operate same at the location where it now is and in the same efficient manner in which it now is and always has been operated," and (to quote from its brief) "There is no suggestion in the proof from any witness or any source that the plant will be moved or its operation cease, or the methods followed in the operations will be changed." While denying that the odors and flies were in extent sufficient to produce actionable damage, the City admitted in its pleadings that some odors and flies were produced as a necessary incident to the proper operation of the plant. That the City was cognizant of the method of operation is manifest. The controversy had been in the courts since shortly after the plant was put in operation. Over three years had passed since operation began, and substantially the same conditions as to odors had existed during the entire period. For this condition the City was liable for consequential damage to property, independently of any issue of negligence. If negligent operation (assuming its establishment) played any part whatever in the controversy, it was only on the theory of non-liability of the City for torts of its employees, and as such constituted a defense which required pleading and proof to establish its existence and the extent of its contribution to the injury.

Under the above analysis of the pleadings and evidence, the injuries (alleged and found nuisance) were permanent in character and not temporary; and the measure of damages was the depreciation in value (market, if any, otherwise intrinsic) of the land. See Rosenthal v. Taylor, B. & H. Ry. Co., 79 Tex. 325, 15 S.W. 268; 31 Tex.Jur., p. 414, § 5. Mitchell cites Austin v. Bush, Tex.Civ.App., 260 S.W. 300 error dismissed, in support of the court's finding of temporary nuisance. The situation there was essentially different than that here. There the court in its charge to the jury assumed that the injurious conditions of its sewage disposal plant were permanent, and refused to submit the issue of temporary nuisance. The City had introduced "proof to show that said plant can and in good faith will, be improved and operated in the future, so as not to permit

noxious gases, odors or vapors to emanate therefrom, and defendant has already voluntarily begun and has progressed to a great extent toward remedying any nuisance that may have existed or that may now exist on account of such operation." To such situation that here presents a marked contrast. Here the City plead the permanency, not only of the location and manner of construction of the plant, but also its manner of operation. The City had failed for a period of over three years to remedy the situation (if in fact it was remediable), although protest by suit and otherwise had been made from the beginning of operation. Under these circumstances the injuries complained of and found by the trial court must be regarded as permanent (not temporary) in character. Rosenthal case, above.

The trial court's judgment is reversed and the cause remanded.

Reversed and remanded.