# IN THE SUPREME COURT OF TEXAS

No. 15-0049

CROSSTEX NORTH TEXAS PIPLELINE, L.P., N/K/A ENLINK NORTH TEXAS PIPELINE, LP, PETITIONER,

v.

ANDREW GARDINER AND SHANNON GARDINER, RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE SECOND DISTRICT OF TEXAS

**Argued March 29, 2016**

JUSTICE BOYD delivered the opinion of the Court.

This is a nuisance case, but that does not tell you much. As a legal concept, the word nuisance "has meant all things to all people." W. PAGE KEETON ET AL., PROSSER AND KEETON ON TORTS § 86, at 616 (5th ed. 1984) [hereinafter PROSSER AND KEETON]. Courts have used it to identify the cause or source of a harm, the harm suffered, and the resulting liability. RESTATEMENT (SECOND) OF TORTS § 821A cmt. b (AM. LAW. INST. 1979). The state of the nuisance doctrine some seventy years ago led Dean Prosser to declare nuisance as the law's "garbage can." William L. Prosser, *Nuisance Without Fault*, 20 TEX. L. REV. 399, 410 (1942) [hereinafter *Nuisance Without*

*Fault*]. More recently, members of this Court and of the United States Supreme Court have been equally as critical.[1]

Today we again face the challenge of determining what constitutes a "nuisance" that gives rise to liability under Texas law. Taking this opportunity to clarify the law, we hold that the term "nuisance" refers not to a defendant's conduct or to a legal claim or cause of action but to a type of legal injury involving interference with the use and enjoyment of real property. We further clarify that a defendant can be liable for causing a nuisance if the defendant intentionally causes it, negligently causes it, or—in limited circumstances—causes it by engaging in abnormally dangerous or ultra-hazardous activities. We affirm the court of appeals' judgment remanding this case to the trial court for a new trial, in which the parties and court should apply the guidance we provide today.

## I.
## Background

Crosstex North Texas Pipeline, L.P., owns and operates a natural-gas pipeline that runs approximately 130 miles from Tarrant County to Lamar County in northeast Texas. When Crosstex was preparing to construct the pipeline in 2005, it purchased a 20-acre tract along the pipeline's projected path in a rural part of Denton County to use as a storage yard during construction and as a prospective site for a compressor station. Andrew and Shannon Gardiner

---

[1] According to Justice Blackmun, "one searches in vain . . . for anything resembling a principle in the common law of nuisance." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1055 (1992) (Blackmun, J., dissenting). Nuisance, he said, "is an area of law that 'straddles the legal universe, virtually defies synthesis, and generates case law to suit every taste.'" *Id.* at 1055 n.19 (quoting WILLIAM H. RODGERS, ENVIRONMENTAL LAW § 2.4, at 48 (1986)). In 2004, this Court noted that the Texas test for distinguishing temporary nuisances from permanent ones "has no standard of reference," and thus leads to irreconcilable precedent in our courts. *Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 274–75 (Tex. 2004), *holding modified on other grounds*, *Gilbert Wheeler, Inc. v. Enbridge Pipelines (E. Tex.), L.P.*, 449 S.W.3d 474 (Tex. 2014). We observed that nuisance law was such a morass that although half of the precedent had to be wrongly decided, we could not say which half that was. *Id.* at 274.

own an undeveloped 95-acre ranch, and its southwest corner lies directly across a farm-to-market road from Crosstex's 20-acre tract. The Gardiners had previously purchased the ranch as an investment property and as a place to raise cattle, ride horses, and enjoy as a family until a future sale. A few days after Crosstex purchased the 20-acre tract, its agent contacted the Gardiners and offered to purchase an easement to run the pipeline across the southwest corner of the Gardiners' ranch. The Gardiners initially resisted but ultimately agreed to sell the easement after Crosstex's agent increased the offer price and threatened condemnation proceedings. The agent did not mention that Crosstex had purchased the adjacent 20-acre tract as a possible site for a compressor station. The Gardiners granted Crosstex an easement and right-of-way in January 2006.

Crosstex quickly completed construction and began operating the pipeline a few months later. Due to the high volume of natural-gas production occurring in the Barnett Shale at that time, Crosstex decided to install a compressor station along the line to increase the pipeline's capacity. Crosstex decided to construct the compressor station on the 20-acre tract because that location was about halfway along the pipeline, was easily accessible by good roads, and was surrounded by "quite a bit of open land." Although Crosstex concluded, based on area sound-level measurements, that noise-mitigation measures were unnecessary, it installed "hospital-grade" mufflers on the compressor-station engines, which are more effective in suppressing engine noise than "regular-grade" mufflers but not as effective as "critical or super-critical" mufflers.

The compressor station includes four diesel engines that are each "bigger than mobile homes." Typically, at least one of the engines runs continuously all day and night. The Gardiners testified that, before the compressor station began operating in May 2007, their ranch was "peaceful and quiet," with "just the usual country sounds." Immediately after Crosstex activated

3

the compressor station, the Gardiners and others began complaining to Crosstex about the station's "constant roar." Multiple witnesses described the noise as being as loud as a jet airplane or "an engine of a locomotive sitting on [the] driveway." Crosstex's own public relations specialist, who visited the station a few days after the complaints began, wrote in her notes that the noise was "BAD" throughout the area and "VERY LOUD" in the areas closest to the station. She reported that a person standing near the road by the station would have to "scream" to be heard, and she agreed that the noise was louder than it should have been and louder than Crosstex intended it to be. *Id.* at 161.

The next month, the Gardiners and others sent a letter to Crosstex complaining about the noise and demanding that Crosstex enclose the engines within a building containing sound-absorbing insulation and construct a sound wall around the property. Later that month, Crosstex hosted a meeting with dozens of neighbors, including the Gardiners, and promised to take steps to mitigate the noise. Crosstex then hired a professional sound-control firm to conduct studies, and based on the firm's recommendations, began implementing a series of mitigation efforts. Over the next four years, Crosstex constructed a partially enclosed building around the engines (but not a fully enclosed building as the neighbors had demanded), installed sound blankets inside the building's walls, installed sound walls on three sides of the building, and planted vegetation around the building and walls. Crosstex believed these measure were enough to eliminate any unreasonable noise levels.

The Gardiners did not agree. Because Crosstex installed sound walls on three sides, but not on the side that faced the Gardiners' ranch, they complained that the walls merely funneled the noise toward their property. In January 2008, they sent an email complaining that the noise and

4

vibrations remained like "a helicopter . . . hovering" above them. In March 2008, they sent another email complaining of the "constant deafening noise." At the end of March, the Gardiners' attorney sent Crosstex a letter asserting that the mitigation efforts Crosstex had made and still proposed to make were inadequate to "ameliorate the damages Crosstex has caused to [the Gardiners'] property."

In May 2008, the Gardiners filed this suit, asserting claims for private nuisance, ordinary negligence, and gross negligence. In response to Crosstex's special exceptions, they later amended their petition to allege that Crosstex had both intentionally and negligently created a nuisance. Meanwhile, Crosstex continued its efforts to mitigate the noise. In December 2010, its expert conducted another noise study and took recordings that he later played for the jury. Based on this study, the expert concluded that the noise in various locations around the station was either "compatible" or "marginally compatible" with neighboring agricultural land. He concluded the noise levels on the Gardiners' tract were acceptable and reasonable for agricultural tracts, compatible with the use of the ranch to graze livestock, and compatible in most of the ranch for residential use.

The Gardiners still did not agree. In September 2011, in response to continued complaints, Crosstex installed air intake silencers at the station. Two months later, it installed a fifteen-foot sound wall on the east side of the station, which faces the Gardiners' ranch. Nevertheless, when the case went to trial in January 2012, the Gardiners and several others testified that the noise remained a constant and unacceptable roar. The Gardiners testified that the noise had not significantly improved since Crosstex built the station four years earlier, that it still sounded like a train and was "really loud[]," that it still interfered with their use and enjoyment of the ranch,

and that Crosstex's expert's testimony that the noise was inaudible in some areas "was not true." Multiple neighbors and other witnesses also testified that the noise remained extremely loud at the time of trial.[2] The Gardiners acknowledged that Crosstex had made many mitigation efforts over the years and had not consciously disregarded their concerns, but they believed the efforts were simply ineffective. They complained that the compressor station had greatly diminished their ranch's value and ruined both their financial investment and their ability to use and enjoy their land.

After receiving the evidence at trial, the trial court directed a verdict for Crosstex on the Gardiners' ordinary-negligence claim but agreed to submit the intentional-nuisance and negligent-nuisance claims to the jury. The Gardiners requested that the court also submit a question on whether Crosstex non-negligently created a nuisance by engaging in an activity that was "abnormal and out of place in its surroundings," but the Gardiners had never pled that theory and the trial court refused to permit a trial amendment. The jury failed to find that Crosstex "intentionally and unreasonably created a nuisance as to" the Gardiners' ranch, but did find that Crosstex "negligently" created a nuisance. The jury found that the nuisance was permanent, as opposed to

---

[2] One neighbor testified that the noise was "still just as loud," that "you can't do anything out there without being bothered by it," and that as of a week before trial it was still loud on the Gardiners' property because the mitigation efforts "just haven't helped the sound much." Another, whose home was closest to the compressor station, testified that the noise was unacceptable, like "an engine of a locomotive sitting on [his] driveway," and "very loud" at the Gardiners' property. Another neighbor testified that he visited the Gardiners' ranch the day before he testified and the noise was a "rumbling like a locomotive-type engine or diesel engine" and "louder than [he had] ever heard it" before. A local property developer testified that he visited the Gardiners' ranch that morning and the noise was like "a locomotive engine on a train as consistent humming, vibration, loud noise." Another neighbor testified that the noise was like "standing in the middle of an airport with jet airplanes taking off all around" and was still "extremely loud" despite the mitigation efforts. She also testified that a Crosstex representative had told her that "the building really needed to be fully enclosed, but that would cost . . . a lot of money and Crosstex didn't have the money and that [the representative] wouldn't want to live by [the station] either." 451 S.W.3d at 172 (omission in original).

temporary, and caused the ranch's fair market value to decline by over $2 million. The trial court rendered judgment on the jury's verdict for the Gardiners on their negligent-nuisance claim.

Crosstex appealed, and the court of appeals held that the evidence was legally sufficient but not factually sufficient to support the jury's finding of a negligently created nuisance. 451 S.W.3d at 176. It also held that the trial court erred by denying the Gardiners' request for a trial amendment and should have submitted a jury question on whether Crosstex created a nuisance through conduct that was "abnormal and out of place." *Id.* at 177, 179. The court reversed the trial court's judgment and remanded the case "for a new trial and to allow the Gardiners to add the abnormal and out-of-place variation of their nuisance claim." *Id.* at 179. Both parties filed petitions for review, which we granted.

## II.
## Private Nuisance

The law of "nuisance" seeks to balance a property owner's right to use his property "as he chooses in any lawful way" against his duty not to use it in a way that "injure[s] another." *Gulf, Colo. & Santa Fe Ry. Co. v. Oakes*, 58 S.W. 999, 1000 (Tex. 1900). While the objective may seem simple enough, the "application of these principles gives rise to some of the most difficult questions and delicate distinctions known to the law." *Id.*; *see also, e.g.*, *Schneider*, 147 S.W.3d at 268 (asserting that the distinction between a temporary nuisance and a permanent one is "one of the oldest and most complex in Texas law"). Dean Prosser famously wrote that there "is perhaps no more impenetrable jungle in the entire law than that which surrounds the word 'nuisance.'" WILLIAM L. PROSSER, LAW OF TORTS § 88, at 592 (3d ed. 1964) [hereinafter PROSSER, 3d ed.].

This Court has previously declined opportunities to comprehensively describe the requirements and limits of a claim alleging nuisance under Texas law. In *Oakes*, the Court

7

concluded that the question ultimately boils down to whether the defendant's use of its property "is a reasonable one, under all the circumstances," and explained that it was "unable to discover that the law does, or, from the nature of the subject, can, furnish a more definite rule" than that. *Oakes*, 58 S.W. at 1001. Similarly, the Court once observed that there is "general agreement that [nuisance liability] is incapable of any exact or comprehensive definition," and thus declared that "we shall attempt none here." *Wales Trucking Co. v. Stallcup*, 474 S.W.2d 184, 186 (Tex. 1971).

Dean Prosser, however, has lamented that American jurisprudence on nuisance liability illustrates an unfortunate yet "familiar tendency of the courts to seize upon a catchword as a substitute for any analysis of a problem." PROSSER, 3d ed. § 87, at 592. Whether that is true or not, we agree that the lack of a clear delineation of the circumstances in which the law imposes liability against one who creates a nuisance can lead to confusion, and has done so here. We will thus attempt to provide a more comprehensive, though certainly not exhaustive, explanation of the circumstances in which Texas law may hold a party liable for causing a private nuisance.[3] In this section, we begin by discussing the definition of a "nuisance" and then explain that nuisance is merely a type of legal injury and not a cause of action in and of itself. We then discuss the types of conduct for which a defendant can be legally liable for creating a nuisance, and conclude by confirming that whether a defendant is liable for creating a nuisance generally presents fact issues for the jury to decide.

---

[3] The common law also recognizes a claim for "public nuisance," which generally addresses conduct that interferes with "common public rights" as opposed to private individual rights. *See* PROSSER, 3d ed. § 87, at 593–94. Although a public nuisance may also be a private nuisance, they are two distinct conditions with different requirements and limitations. *See id.* at 594 (lamenting that the use of the word "nuisance" to describe both theories has contributed to confusion). We need not and do not address public nuisances in this case.

## A. Definitions of Private Nuisance

In its earlier years, this Court expressed no particular difficulty in defining or applying the term "nuisance." Relying on Blackstone's explanation that "whatsoever unlawfully annoys or doth damage to another is a nuisance," *Allen v. State*, 34 Tex. 232 (1870), the Court found the term to be both "well defined," *Burditt v. Swenson*, 17 Tex. 489, 502 (1856), and "well understood," *Miller v. Burch*, 32 Tex. 208, 210 (1869). Because the word "means, literally, annoyance," a private nuisance was simply "anything done to the hurt or annoyance of the lands, tenements, or hereditaments of another." *Burditt*, 17 Tex. at 502.[4] In fact, the Court considered the meaning so clear that it had no difficultly upholding a statute that made it a criminal violation to commit any "acts held to be nuisances under the common law." *Allen*, 34 Tex. at 232 (holding defendant could be criminally charged for "unlawfully doing an act which annoys or damages others").

The Court's early decisions, however, support Dean Prosser's observation that the term nuisance came "by a series of historical accidents to cover the invasion of different kinds of interests, and of necessity to refer to various kinds of conduct on the part of the defendant." PROSSER, 3d ed. § 87, at 593. This Court recognized early on that a nuisance could result from an array of actions by a wide variety of defendants,[5] and could involve interference with numerous

---

[4] *See also Brewster v. City of Forney*, 223 S.W. 175, 177 (Tex. 1920) ("[A]nything that worketh hurt, inconvenience, or damage, or which is done to the hurt of the lands, tenements, or hereditaments of another, is a nuisance."); *Comminge v. Stevenson*, 13 S.W. 556, 557 (Tex. 1890) (explaining that a nuisance is a "'thing that worketh hurt, inconvenience, and damage' to plaintiff in both his person and property, in violation of his right to enjoy his property free from such hurt, inconvenience, and damage"); *Jung v. Neraz*, 9 S.W. 344, 345 (Tex. 1888) (explaining that neighbors share "a common interest in protecting their possession against an act that 'worketh hurt, inconvenience, or damage' thereto"); *Miller*, 32 Tex. at 210 (describing a nuisance as "anything that worketh hurt, inconvenience, or damage").

[5] *See, e.g.*, *Brewster*, 223 S.W. at 176–77 (operating a sewage disposal plant); *Rainey v. Red River, Tex. & S. Ry. Co.*, 89 S.W. 768, 770 (Tex. 1905) (use of railroad tracks and roundhouses); *Austin & Nw. Ry. Co. v. Anderson*, 15 S.W. 484, 485 (Tex. 1891) (construction of embankments and culverts to channel water); *Comminge*, 13 S.W. at 557 (maintaining a gun-powder storage facility); *Dunn v. City of Austin*, 11 S.W. 1125, 1127 (Tex. 1889) (operating a cemetery); *Allen*, 34 Tex. at 233 (operating a tallow or beef factory); *Miller*, 32 Tex. at 210 (maintaining a

different interests through both physical substances and intangible conditions, such as "water, stones, rubbish, filth, smoke, dust, odors, gases, noises, vibrations, and the like." *Oakes*, 58 S.W. at 1001. In short, the Court's early opinions confirmed that a landowner can be liable in nuisance for almost any conduct creating almost "anything likely to do mischief" to a neighbor. *Id.* at 1000. *But see Wales Trucking*, 474 S.W.2d at 185–86 (rejecting claim based on dust caused by defendant's trucks as they drove on an unpaved public highway).

Of course, the Court's early opinions did not rely *solely* on Blackstone's definition and impose liability for "*anything* that worketh hurt, inconvenience, or damage." Instead, they expounded on that definition by explaining that the defendant can be liable only if the defendant's "hurtful" or "annoying" conduct caused "an unnecessary and unreasonable interference" with the plaintiffs' use and enjoyment of their land. *Oakes*, 58 S.W. at 1001. But a defendant who created such an interference could be liable for harming a wide variety of the plaintiffs' interests by, for example, harming the plaintiffs' health, *Burditt*, 17 Tex. at 502, offending the plaintiffs' "senses," *id.*, or interfering with the plaintiffs' enjoyment of, or operation of a business on, their land, *Oakes*, 58 S.W. at 1001. A defendant's conduct, in other words, could create liability "if it occasions that which is offensive to the senses, and which renders the enjoyment of life and property uncomfortable." *Burditt*, 17 Tex. at 502.

Ultimately, the early cases reflected the Court's ongoing effort to balance a property owner's right to use his property as he desires against his duty not to use the property in a way that

---

"disorderly" building hosting "particular trades"); *Burditt*, 17 Tex. at 503 (construction, maintenance, or operation of a horse stable).

unreasonably injures a neighbor's rights to use her own property. *See, e.g.*, *Oakes*, 58 S.W. at 1000. To determine what was "reasonable," the Court identified numerous factors, depending on the facts of any given case. Typically, the Court considered the "location and surroundings" important, though not determinative. *E.g.*, *Storey v. Cent. Hide & Rendering Co.*, 226 S.W.2d 615, 618 (Tex. 1950). Thus, a business that is "otherwise lawful may be a nuisance because of the place where it is located or carried on, and although it is not in itself a nuisance, it may become such when it is located in a place forbidden by law or wholly uncongenial to its type of enterprise." *Id.* By contrast, the Court was typically quick to reject claims when a neighbor's "disagreeable" use of its property was simply "one of the results of residing in cities and towns." *E.g.*, *Sherman Gas & Elec. Co. v. Belden*, 123 S.W. 119, 120–21 (Tex. 1909); *see also League v. Journeay*, 25 Tex. 172, 173 (1860) ("The ordinary growth of a city . . . will always have the effect to make lots . . . less desirable and less valuable as residences for families.").

In other cases, the Court considered the importance of the defendant's conduct to the defendant and to the community. Thus, "when expensive plants have been erected and are used in carrying on a useful business[,] adjacent property owners will not be permitted to maintain actions for every trifling annoyance which such business causes them." *Storey*, 226 S.W.2d at 618. But "the fact that the business is a useful or necessary one or that it contributes to the welfare and prosperity of the community is not determinative," and "the law does not allow one to be driven from his home or compelled to live in substantial danger or discomfort even though the danger or discomfort is caused by a lawful and useful business." *Id.* Ultimately, although the Court made little effort in its early opinions to comprehensively delineate all of a nuisance claim's elements and requirements, it refused to narrow the claim to impose liability for only certain types of

11

conduct or to protect only certain types of interests. Instead, it consistently considered a wide variety of scenarios and factors and emphasized that whether an interference was actionable as a private nuisance depended ultimately on what was "reasonable . . . under all the circumstances." *Oakes*, 58 S.W. at 1001.

More recently, this Court has consistently used a more comprehensive definition of a private nuisance: "A 'nuisance' is a condition that substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities attempting to use and enjoy it." *Holubec v. Brandenberger*, 111 S.W.3d 32, 37 (Tex. 2003); *see also Nat. Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 153 (Tex. 2012) (citing *Schneider*, 147 S.W.3d at 269) (stating same); *Barnes v. Mathis*, 353 S.W.3d 760, 763 (Tex. 2011) (citing *Schneider*, 147 S.W.3d at 269) (stating same); *Schneider*, 147 S.W.3d at 269 (citing *Holubec*, 111 S.W.3d at 37) (stating same). This definition derives from this Court's early "hurtful-and-inconvenient" definition, but reflects Texas courts of appeals' efforts to incorporate the requirement that the hurt and inconvenience be "substantial" and "unreasonably" annoying or discomforting to a person of "ordinary sensibilities." *See Holubec*, 111 S.W.3d at 37 (citing *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 461–62 (Tex. 1993); *Burditt*, 17 Tex. at 503; *Maranatha Temple, Inc. v. Enter. Products Co.*, 893 S.W.2d 92, 98–99 (Tex. App.—Houston [1st Dist.] 1994, writ denied)).[6] We confirm today that this definition, which the trial court used

---

[6] The court of appeals in *Maranatha Temple* cited to a number of court of appeals cases for this definition. *See Bible Baptist Church v. City of Cleburne*, 848 S.W.2d 826, 829 (Tex. App.—Waco 1993, writ denied); *Meat Producers, Inc. v. McFarland*, 476 S.W.2d 406, 411 (Tex. Civ. App.—Dallas 1972, writ ref'd n.r.e.); *City of Temple v. Mitchell*, 180 S.W.2d 959, 962 (Tex. Civ. App.—Austin 1944, no writ); *Bily v. Omni Equities, Inc.*, 731 S.W.2d 606, 611 (Tex. App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.). It appears that the Dallas Court of Appeals first articulated the current definition in *Meat Producers*. 476 S.W.2d at 410 (defining "nuisance" as "a condition which substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to

when instructing the jury in this case, appropriately describes a private nuisance that may be actionable under the common law.

## B. A Legal Injury

As noted, courts have used the term "nuisance" in a variety of ways, including as a reference to a particular legal cause of action, a defendant's conduct that gives rise to that cause of action, an event or activity or operation that is the "cause or source of a harm," the harm itself, and the liability that results from that harm. *See* RESTATEMENT (SECOND) OF TORTS § 821A cmt. b. To reduce the confusion that has resulted from these varied uses of the term, we believe the better approach is to utilize the term "nuisance" to refer not to a cause of action or to the defendant's conduct or operations, but instead to the particular type of *legal injury* that can support a claim or cause of action seeking legal relief. *See City of Tyler v. Likes*, 962 S.W.2d 489, 504 (Tex. 1997) (noting that private nuisance is "a kind of damage done, rather than any particular type of conduct" (quoting *Nuisance Without Fault* at 416)); *see also* PROSSER, 3d ed. § 88, at 594 (stating that private nuisance "has reference to the interests invaded, to the damage or harm inflicted, and not to any particular kind of act or omission which has led to the invasion").

In other words, we clarify today that the term "nuisance" describes a type of injury that the law has recognized can give rise to a cause of action because it is an invasion of a plaintiff's legal rights. *See, e.g.*, *Atkins v. Crosland*, 417 S.W.2d 150, 153 (Tex. 1967) (quoting 54 C.J.S. *Limitations of Actions* § 168, pp. 122–23); *Hous. Waterworks Co. v. Kennedy*, 8 S.W. 36, 37 (Tex.

persons of ordinary sensibilities attempting to use and enjoy it" (citing *Sherman Gas & Elec. Co. v. Belden*, 123 S.W. 119 (Tex. 1909); *City of Temple v. Mitchell*, 180 S.W.2d 959 (Tex. Civ. App.—Austin 1944, no writ)).

1888). The law has recognized numerous types of legal injuries, including injuries to a person's body, reputation, property, right to privacy, or right to exclusive possession of property. *See, e.g.*, *Billings v. Atkinson*, 489 S.W.2d 858, 860 (Tex. 1973) (recognizing that "an unwarranted invasion of the right of privacy constitutes a legal injury"). The law of nuisance recognizes that certain injuries to a person's right to the "use and enjoyment of property" can also constitute a form of legal injury for which a legal remedy will be granted. *Likes*, 962 S.W.2d at 504.

A legal injury, however, is neither the breach of a duty that gives rise to liability for the legal injury nor the damages that may be awarded as compensation for the legal injury. *A. Harris & Fox v. Finberg*, 46 Tex. 79, 97 (1876) (describing "actual damages" as "legal compensation for the legal injury"). We have recognized, for example, that "a cause of action generally accrues when a wrongful act causes some legal injury, . . . even if all resulting damages have not yet occurred." *Valdez v. Hollenbeck*, 465 S.W.3d 217, 229 (Tex. 2015); *see also Atkins*, 417 S.W.2d at 153 (noting that an "act causing the damage" may or may not "of itself constitute a legal injury" (quoting 54 C.J.S. *Limitations of Actions* § 168 at 122–23)). Today we clarify that the term "nuisance" does not refer to the "wrongful act" or to the "resulting damages," but only to the legal injury—the interference with the use and enjoyment of property—that may result from the wrongful act and result in the compensable damages. But as the definition we have approved makes clear, such an interference qualifies as a nuisance—and thus as a legal injury—only if the interference is "substantial" and causes "discomfort or annoyance" that is "unreasonable." Our precedent, as well as English and American common law in general, supports these two qualifications.

### 1.    *Substantial* Interference[7]

By requiring a "substantial" interference with the plaintiffs' use and enjoyment of their property, our precedent sets a minimum threshold that confirms that the law "does not concern itself with trifles, or seek to remedy all of the petty annoyances and disturbances of every day life in a civilized community even from conduct committed with knowledge that annoyance and inconvenience will result." PROSSER AND KEETON § 88, at 626. Thus, for example, while noises or odors from a horse stable might occasionally or minimally "interfere" with the enjoyment of neighboring land, they can create a nuisance only if the stable is "so kept, or so used, as to destroy the comfort of persons owning and occupying adjoining premises, and impair their value." *Burditt*, 17 Tex. at 504. Similarly, a cemetery may be a nuisance only if its "locality or manner of use" substantially interferes with the plaintiffs' interests. *Dunn v. City of Austin*, 11 S.W. 1125, 1127 (Tex. 1889). And because gunpowder must be stored somewhere, its storage can create a nuisance when it is a "constant source of apprehension and alarm," prevents the plaintiffs from renting their land "at any price," and substantially reduces the land's market value. *Comminge*, 13 S.W. at 557.

Of course, "what is substantial will vary, within limits, according to circumstances." HARPER § 1.24, at 122. Whether an interference is substantial or merely a "trifle" or "petty

---

[7] While our definition of "nuisance" has consistently referred to an "interference" with the use and enjoyment of property, the Restatement and other authorities refer to an "invasion" of a legal "interest" in the use and enjoyment of property. *See, e.g.*, RESTATEMENT (SECOND) OF TORTS § 822 ("One is subject to liability for a private nuisance if . . . his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land . . . ."); FOWLER V. HARPER, FLEMING JAMES, JR., OSCAR S. GRAY, HARPER, JAMES AND GRAY ON TORTS § 1.23, at 90 (3d ed. 2006) [hereinafter HARPER] ("A private nuisance is an invasion . . . of the private use and enjoyment of land."). We believe that our reference to an "interference" incorporates the concept of an "'invasion' of a legal interest" in the use and enjoyment of property, such that there is no real difference in the meanings of the two approaches. For the sake of consistency with our precedent, we will continue to use the term "interference," as other authorities do. *See, e.g.*, DAN B. DOBBS, PAUL T. HAYDEN, & ELLEN M. BUBLICK, THE LAW OF TORTS § 399, at 618 (2d ed. 2011) [hereinafter DOBBS] ("A private nuisance today is a condition or activity that interferes with the possessor's use and enjoyment of her land . . . ." (footnotes omitted)); PROSSER AND KEETON § 87, at 619 ("The essence of a private nuisance is an interference with the use and enjoyment of land.").

annoyance" necessarily depends on the particular facts at issue, including, for example, the nature and extent of the interference,[8] and how long the interference lasts or how often it recurs. PROSSER, 3d ed. § 88, at 601 ("[T]he duration or recurrence of the interference is merely one—and not necessarily a conclusive—factor in determining whether the damage is so substantial as to amount to a nuisance.").

To support a claim for private nuisance, the condition the defendant causes may interfere with a wide variety of the plaintiffs' interests in the use and enjoyment of their property. It may, for example, cause physical damage to the plaintiffs' property, economic harm to the property's market value, harm to the plaintiffs' health, or psychological harm to the plaintiffs' "peace of mind" in the use and enjoyment of their property. *See* HARPER § 1.23, at 98–100; PROSSER, 3d ed. § 90, at 6113 ("[V]irtually any disturbance of the enjoyment of the property may amount to a nuisance."). But to rise to the level of nuisance, the interference must be "substantial" in light of all the circumstances.

### 1. *Unreasonable* Discomfort or Annoyance

Even a substantial interference, however, does not constitute a nuisance unless the effect of the interference on those who would otherwise use and enjoy their land is "unreasonable." *Holubec*, 111 S.W.3d at 37; PROSSER AND KEETON § 88, at 626. Only a substantial interference that has unreasonable effects constitutes "the kind for which the defendant should be liable in damages." PROSSER AND KEETON § 88, at 628; *see* RESTATEMENT (SECOND) OF TORTS § 829A

---

[8] *See, e.g.*, *Schneider*, 147 S.W.3d at 269 ("There is no question that foul odors, dust, noise, and bright lights—*if sufficiently extreme*—may constitute a nuisance." (emphasis added)); *Anderson*, 15 S.W. at 485 (noting that defendant's construction of an embankment and culverts that diverted water onto plaintiff's land "destroyed" the land and crops); *Allen*, 34 Tex. at 233 (explaining that it is "the sickening and malarious influence of one of our modern tallow and beef factories" that makes it "a disgusting and nauseous nuisance").

(defining unreasonable invasion as when "the harm resulting from the invasion is severe and greater than the other should be required to bear without compensation"). Regarding this unreasonableness requirement, we highlight three points. First, it focuses on the unreasonableness of the interference's effect on the plaintiff's comfort or contentment, not on the unreasonableness of the defendant's conduct or land use. Second, unreasonableness must be determined based on an objective standard of persons of ordinary sensibilities, not on the subjective response of any particular plaintiff. And third, as is typical with legal inquiries into reasonableness, the determination requires balancing a wide variety of factors, depending on the specific facts.

### a. Unreasonable effect, not unreasonable conduct

One area of confusion that has developed through the years, and which arises again in this case, is the question of whether, to prove a nuisance, the plaintiff must establish that the defendant's conduct or land use was unreasonable, or that the effect of the resulting interference with the plaintiff's use and enjoyment of land was unreasonable, or both.[9] This confusion has

---

[9] Dean Prosser, for example, suggested that the reasonableness inquiry should focus on the defendant's conduct, rather than on the resulting interference: "It is only when [the defendant's] conduct is unreasonable, in the light of its utility and the harm which results, that it becomes a nuisance." PROSSER, 3d ed. § 88, at 602. Thus, he explained, "there is no liability for nuisance unless the defendant's conduct is unreasonable under the circumstances." *Id.* Within that same section of the same commentary, however, Prosser explained that a private nuisance claim "has reference to the interests invaded, to the damage or harm inflicted, and not to any particular kind of act or omission which has led to the invasion." *Id.* § 88, at 594. He even asserted that courts have placed a "mistaken emphasis upon what the defendant has done rather than the result which has followed." *Id.*

It is no surprise, then, that when Dean Keeton updated Prosser's hornbook twenty years later, after Prosser's death, Keeton clarified this point, specifically explaining that the unreasonable-interference requirement "does not mean that the defendant's conduct must be unreasonable." PROSSER AND KEETON § 87, at 623. Keeton explained that courts often treat "the interference as being unreasonable although the [defendant's] conduct is regarded as reasonable and socially desirable. The two concepts—unreasonable interference and unreasonable conduct—are not at all identical." *Id.* Keeton explained that confusion had resulted from the fact that "interference with the plaintiff's use of his property can be unreasonable even when the defendant's conduct is reasonable." *Id.* § 88, at 629. "This is simply because a reasonable person could conclude that the plaintiff's loss resulting from the intentional interference ought to be allocated to the defendant." *Id.*

Keeton's description more accurately reflects this Court's precedent, as well as that of other American courts and commentators. *See, e.g.*, *Pestey v. Cushman*, 788 A.2d 496, 507 (Conn. 2002) ("While the reasonableness of a defendant's conduct is a factor in determining whether an interference is unreasonable, it is *not* an independent element

17

resulted, we believe, from the tendency of courts and parties to use the term "nuisance" to describe the cause of action asserted or the defendant's conduct instead of the legal injury that results from the conduct and supports the cause of action. Today we clarify that to prove a nuisance (that is, a legal injury based on interference with use and enjoyment of land), a plaintiff must establish that the effects of the substantial interference on the plaintiff are unreasonable—not that the defendant's conduct or land use was unreasonable. While (as discussed below) proving a cause of action alleging nuisance requires more than just proof of the legal injury, proving the existence of the legal injury itself only requires proof that the effect of the substantial interference is unreasonable. *See* DOBBS § 401, at 625 ("'Unreasonable' in nuisance law . . . does not refer to risk-creating conduct of the defendant but to the reasonable expectations of a normal person occupying the plaintiff's land.").

This clarification is wholly consistent with our precedent, from our earliest decisions to our most recent. In *Oakes*, for example, the Court referred to a nuisance as an "unreasonable interference," and explained that a defendant's conduct that is "useful and lawful in itself" can nevertheless create a nuisance if the conduct creates an "unreasonable interference" with the plaintiffs' use and enjoyment of their land. 58 S.W. at 1001. In *Anderson*, the Court noted that the defendant's construction of an embankment and culverts "was not of itself a nuisance" and was "no invasion of plaintiff's rights," and only created a nuisance when they diverted destructive

---

that must be proven in order to prevail in all private nuisance causes of action. The inquiry is cast more appropriately as whether the defendant's conduct unreasonably interfered with the plaintiff's use and enjoyment of his or her land rather than whether the defendant's conduct was itself unreasonable."); *State v. Lloyd A. Fry Roofing Co.*, 246 N.W.2d 692, 695 (Minn. 1976) ("The general rule regarding nuisances is that 'it is immaterial how innocent the intent was for the element of motive or intent does not enter into the question of nuisance.'" (quoting JOSEPH A. JOYCE & HOWARD C. JOYCE, TREATISE ON THE LAW GOVERNING NUISANCES § 43, at 77 (1906))); DOBBS § 399, at 619 n.5 ("Nuisance does not, however, require unreasonable actions by the defendant, only that the plaintiff cannot reasonably be expected to bear the harm.").

waters onto the plaintiff's land. 15 S.W. at 485. In *Brewster*, the Court explained that the defendant's otherwise-lawful plant was a nuisance only because "the condition created by the plant made plaintiff's place undesirable as a residence." 223 S.W. at 177. In *Likes*, the Court explained that a nuisance does not depend on the type of conduct that creates it, but on the "kind of damage done." 962 S.W.2d at 504 (quoting *Nuisance Without Fault* at 416). In *Holubec*, the Court stated that the "discomfort or annoyance" must be unreasonable. 111 S.W.3d at 37. And most recently, in *Justiss*, the Court concluded that a gas-compressor station was a nuisance because the plaintiffs complained that "the station's noise, odor, and lights interfered with the enjoyment of their homes." 397 S.W.3d at 152.

Despite this precedent, Crosstex contends that to prove a nuisance, the plaintiff must also establish that the defendant's conduct or land use was unreasonable. In support, Crosstex relies on *Vestal v. Gulf Oil Corp.*, in which the Court held that plaintiffs alleging a nuisance bore the burden to "plead and prove and secure a jury finding that the use of the . . . property by the [defendant] was unreasonable." 235 S.W.2d 440, 442 (Tex. 1951). This statement, however, addressed the issue of whether the defendant could be legally liable for its interference with the plaintiffs' use and enjoyment of their property, not whether the interference itself was sufficient to constitute a nuisance.

The plaintiffs in *Vestal* sued Gulf Oil, alleging that fumes released from vent pipes in gasoline-storage tanks blew onto their adjacent property, "constantly menaced their safety and property," negatively "affected their health and their peace of mind," and constituted a private nuisance. *Id.* at 441. The defendant appealed an adverse judgment, arguing (among other things) that the evidence did not support the jury's finding of a nuisance and that the trial court erred by

19

asking the jury whether the defendant's use of its property was reasonable because that question improperly shifted the burden onto the defendant to prove that it was. *Id.* at 442.

The court of appeals rejected the defendant's first argument, holding that sufficient evidence demonstrated that the "annoyance or inconvenience" was "material or substantial" enough to "constitute a nuisance." *Gulf Oil Corp. v. Vestal*, 231 S.W.2d 523, 525 (Tex. Civ. App.—Fort Worth 1950), *aff'd*, 235 S.W.2d 440 (1951). It sustained the defendant's second argument, however, noting that the trial court did not submit a question "inquiring as to any negligence on the part of [defendant]." *Id.* Because no question asked the jury whether the defendant's "negligence or wil[l]fulness" caused the interference, the court held that the challenged question was necessary because "there must be a finding . . . that the act or acts complained of amounted to a nuisance." *Id.* at 526.[10] Because the wording of the jury question effectively required the defendant to prove that its conduct was "reasonable," when it should have required the plaintiffs to prove that it was "unreasonable," the court reversed the judgment and remanded the case. *Id.* This Court affirmed, explaining as to the jury-charge issue that the jury question did not require the plaintiffs to meet their burden of proving that the defendant's use of its property was "*not* reasonable." 235 S.W.2d at 442 (emphasis added).

---

[10] This statement by the court of appeals in *Vestal* illustrates the kind of loose language that has contributed to the confusion we have described. Instead of saying that there must be a finding that the defendant engaged in conduct that makes it legally liable for the interference that the court agreed constitutes a "nuisance," the court stated that there must be a finding that "the act or acts complained of amount to a nuisance." 231 S.W.2d at 526. In doing so, the court used the term to refer both to the interference and to the conduct that creates the interference, as many other courts have done. *See* RESTATEMENT (SECOND) OF TORTS § 821A cmt. b (noting that courts have used the word to identify the cause or source of a harm, the harm suffered, and the resulting liability). As discussed below, that confusion led the trial court here to incorrectly ask the jury whether Crosstex "intentionally and *unreasonably*" created a nuisance. By clarifying that the term "unreasonable" refers only to the type of interference and effects that constitute a legal injury, we hope to eliminate, or at least reduce, that kind of confusion in future cases.

This holding, however, did not relate to the question of whether the interference the plaintiffs alleged was sufficiently substantial or its effects sufficiently unreasonable to constitute a nuisance. The court of appeals separately addressed that issue and concluded that it was, and the defendant did not complain to this Court about that conclusion. *Id.* at 441 (noting that the defendant's appeal related only to special issues involving damages and the burden of proof on liability). The issue this Court addressed was not whether the condition causing the interference constituted a nuisance, but whether the defendant could be liable for creating that condition, and we held that it could be liable only if the plaintiffs proved that the defendant's conduct was unreasonable. *Id.* at 442. We discuss below the standards under which a defendant may be liable for creating a nuisance, but for purposes of determining whether an alleged interference with the use and enjoyment of property is a nuisance, we confirm that the plaintiffs must prove only that the effects of the interference (the plaintiff's "discomfort or annoyance") are unreasonable, not that the defendant's conduct or land use was unreasonable.[11]

### b. Objective test

Our precedent confirms that the standard for determining whether the effects of the interference are unreasonable is an objective one. As the Court explained long ago, to constitute a private nuisance, the effects of the defendant's conduct or land use must be "such as would disturb

---

[11] Some confusion on this point may result from the Second Restatement's explanation that a defendant may be liable for invading a plaintiff's interest in the use and enjoyment of land if the invasion is "intentional and unreasonable." *See* RESTATEMENT (SECOND) OF TORTS § 822 (providing that one is "subject to liability for private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either (a) intentional and unreasonable, or (b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities"). This pairing of the terms "intentional" and "unreasonable," however, describes the "invasion" that the defendant's conduct causes, not the defendant's conduct itself. As explained further below, by pairing the two in this manner, the Restatement reflects that, to be liable for intentional nuisance, the defendant must intend to cause the invasion that results from the conduct, and the resulting invasion (not the conduct) must be unreasonable.

and annoy persons of ordinary sensibilities, and of ordinary tastes and habits." *Sherman Gas*, 123 S.W. at 120; *see also City of Abilene v. Downs*, 367 S.W.2d 153, 160 (Tex. 1963) (citing *Sherman Gas*, 123 S.W. at 120). The Court's modern definition of a nuisance expressly states this standard, *Holubec*, 111 S.W.3d at 37, and it is consistent with the view of commentators and other courts around the country, *see* RESTATEMENT (SECOND) OF TORTS § 821F cmt. d. ("The standard for the determination of significant character [of harm] is the standard of normal persons or property in the particular locality."); DOBBS § 399, at 619 ("[T]he interference is not a nuisance if it interferes only with especially sensitive persons or uses."); PROSSER AND KEETON § 88, at 627–28 (explaining that an interference is significant and its effect on the plaintiff unreasonable only if "normal persons living in the area or community would regard the invasion in question as definitely offensive, seriously annoying, or intolerable"); PROSSER, 3d ed. § 88, at 599 (explaining that reasonableness is determined based on the perspective of a "normal person in the community").

Thus, as Harper explains, "It is not enough that plaintiff himself is offended or annoyed if he is peculiarly sensitive. The standard is what ordinary people, acting reasonably, have a right to demand in the way of health and comfort under all the circumstances." HARPER § 1.25, at 127; *see* RESTATEMENT (SECOND) OF TORTS § 821F cmt. d. ("Rights and privileges as to the use and enjoyment of land are based on the general standards of normal persons in the community and not on the standards of the individuals who happen to be there at the time."); *see also* DOBBS § 399, at 619 ("Proof that the nuisance has resulted in a diminution of the land's market value shows or tends to show that the harm is not merely the result of the plaintiff's sensitivity, since loss of market value necessarily means that potential buyers would also be affected by the nuisance.").

22

### c. Numerous factors

The determination of whether a defendant's interference with a plaintiff's use and enjoyment of land is substantial or whether any particular effect of that interference is unreasonable requires consideration and balancing of a multitude of factors, depending on the circumstances of the case at hand. These include, among others:

- the character and nature of the neighborhood, each party's land usage, and social expectations;

- the location of each party's land and the nature of that locality;

- the extent to which others in the vicinity are engaging in similar conduct in the use of their land;

- the social utility of each property's usage;

- the tendency or likelihood that the defendant's conduct will cause interference with the plaintiff's use and enjoyment of their land;

- the magnitude, extent, degree, frequency, or duration of the interference and resulting harm;

- the relative capacity of each party to bear the burden of ceasing or mitigating the usage of their land;

- the timing of each party's conduct or usage that creates the conflict;

- the defendant's motive in causing the interference; and

- the interests of the community and the public at large.

*See* RESTATEMENT (SECOND) OF TORTS §§ 827, 828; DOBBS § 401, at 626–31; HARPER §§ 1.24, at 110, 1.25, at 127; PROSSER AND KEETON § 88, at 630; PROSSER, 3d ed. § 91, at 628. Whether an interference is substantial or the effects of the interference unreasonable in any given case necessarily depends on these and potentially other factors. All of these factors must be "thrown

23

into the scale," and the decision must be made on the basis of what is reasonable under the circumstances. PROSSER, 3d ed. § 90, at 619.

To summarize, we confirm today that the term "nuisance" refers to a "condition that substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities attempting to use and enjoy it." *Holubec*, 111 S.W.3d at 37. It refers to a legal injury that may support a cause of action, but it is not itself the cause of action or the conduct that is necessary to support the cause of action. To establish such a legal injury, the plaintiff must prove that the interference is substantial and the resulting discomfort or annoyance is unreasonable, but need not establish that the defendant's conduct or land use was unreasonable. That issue goes to whether the defendant can be legally liable for creating a nuisance, and we turn to that question next.

### C. Liability Standard of Care

"An injury without wrong does not create a cause of action." *State v. Brewer*, 169 S.W.2d 468, 471 (Tex. 1943). To establish a cause of action for which the law provides a right to relief, at least in the absence of circumstances giving rise to strict liability, "there must not only be an injury or loss but it must have been occasioned by the commission of a legal wrong, that is, violation of legal right and a breach of legal duty." *Id.* (quoting 1 TEX. JUR. 627, § 20) (holding landowners had no legal right to recover damages allegedly resulting from state's widening of a highway across their land). The definition of "nuisance" that we have discussed does not specify whether, to be liable for creating a nuisance, the defendant must have acted illegally, intentionally, negligently, or otherwise. But one should not expect it to when its purpose is to describe a legal injury, not a cause of action.

Our prior decisions have consistently confirmed that a defendant's liability for creating a nuisance does not depend on a showing that the defendant acted or used its property illegally or unlawfully, and we confirm that rule today.[12] Beyond that, the Court recognized early on that a defendant can be liable for creating a nuisance based on "negligence or other culpable conduct." *See Oakes*, 58 S.W. at 1002–03. More recently, in *Likes*, the Court noted almost in passing that courts "have broken actionable nuisance into three classifications: negligent invasion of another's interests; intentional invasion of another's interests; or other conduct, culpable because abnormal and out of place in its surroundings, that invades another's interests." *Likes*, 962 S.W.2d at 503.

Although the First and Second Restatements of Torts generally supported these three categorizations,[13] the Court in *Likes* cited not to the Restatements but to a Waco Court of Appeals'

---

[12] To the contrary, the goal of private-nuisance law is to identify whether and when the law will prohibit an owner's *lawful* use, or require the owner to bear the legal cost of such use, because that lawful use causes a legal injury to another. The Court made this point clear from the beginning in 1856, and repeatedly thereafter: "[I]f one do[es] an act *in itself lawful*, which being done in a particular place necessarily tends to the damage of another's property, it is a nuisance." *Burditt*, 17 Tex. at 505 (emphasis added). Subsequently, the Court explained that even the lawful operation of a cemetery will create a private nuisance when due to "the manner of the use the atmosphere surrounding other property be rendered unwholesome or offensive." *Dunn*, 11 S.W. at 1128. Similarly, the Court explained that, although a gas company "was lawful" and "had the right to conduct [its business] on its own property," the company would be "liable to respond in damages" if its use of the property "seriously or materially interfere[d] with others in the comfortable and peaceful enjoyment of their property," such that "plaintiffs were materially inconvenienced or annoyed in the use of their home." *Sherman Gas*, 123 S.W. at 120. And although a plant is properly and lawfully constructed and operated, the plaintiffs harmed by the plant's operations can still recover for private nuisance. *Brewster*, 223 S.W. at 176–77 (noting Blackstone's explanation that, to so hold is to "closely enforce that exalted rule of gospel morality of doing unto others as we would have them do unto us").

In short, even "a lawful business may become a nuisance in fact when it is operated in such a place or manner as seriously to interfere with the enjoyment of life and property," *Storey*, 226 S.W.2d at 617 (quoting TEX. JUR. 2D *Nuisance* § 21), and "the law does not allow one to be driven from his home or compelled to live in substantial danger or discomfort even though the danger or discomfort is caused by a lawful and useful business," *id.* at 618; *see also* HARPER § 1.24, at 117–18 ("In a number of other American cases, defendants have been held liable in damages for substantial harm inflicted on plaintiff's property interest, although their operations have been lawful and carefully conducted in a suitable place."). We do not suggest that the unlawfulness of a defendant's conduct or property use cannot be relevant in some cases to the question of whether the defendant intentionally or negligently caused the nuisance, or even to whether the effects of the interference were sufficiently unreasonable to constitute a nuisance, but it is beyond well-established in Texas that the plaintiff need not prove that the defendant's conduct was illegal or unlawful, and the fact that the conduct was lawful provides no defense to the claim.

[13] *See* RESTATEMENT (SECOND) OF TORTS § 822 (providing that one is "subject to liability for a private

25

opinion,[14] and then quoted Prosser's 1942 law review article explaining that nuisance is "a field of tort liability, a kind of damage done, rather than any particular kind of conduct." 962 S.W.2d at 504 (quoting *Nuisance Without Fault* at 410).[15] Although the Court has not had occasion to apply or revisit the three categories of culpable conduct since its passing description in *Likes*, several Texas courts of appeals have since relied on *Likes* to develop a body of law identifying them as three separate types of private-nuisance claims.[16] The court of appeals here did the same. 451 S.W.3d at 155 (citing *Mathis*, 377 S.W.3d at 930).

The law's recognition of the three liability categories, however, has proven to be yet another source of confusion in the nuisance arena. Early editions of Prosser's commentary also described the three-category approach, *see* PROSSER, 3d ed. § 88, at 595, but even then Prosser noted that "the dividing line between intent and negligence has not always proved easy to draw,"

---

nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either (a) intentional and unreasonable, or (b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities"); RESTATEMENT (FIRST) OF TORTS ch. 40, scope note (AM. LAW. INST. 1939) ("Thus the tort of private nuisance includes intentional harms, and harms caused by negligent, reckless or ultrahazardous conduct.").

[14] *Likes*, 962 S.W.2d at 503 (citing *Bible Baptist Church v. City of Cleburne*, 848 S.W.2d 826, 829 (Tex. App.—Waco 1993, writ denied)). In *Bible Baptist Church*, the Waco Court cited a 1972 opinion from the Texarkana Court as support for its description of the three categories of private-nuisance claims. 848 S.W.2d at 829 (citing *City of Texarkana v. Taylor*, 490 S.W.2d 191, 192 (Tex. Civ. App.—Texarkana 1972, writ ref'd n.r.e.)). The Texarkana Court, in turn, cited as support Prosser's third edition, a 1944 Ohio decision, and a 1936 decision from Rhode Island. *Taylor*, 490 S.W.2d at 193 (citing PROSSER, 3d ed. § 88; *Taylor v. City of Cincinnati*, 55 N.E.2d 724 (Ohio 1944); *Rose v. Standard Oil Co. of N.Y., Inc.*, 185 A. 251 (R.I. 1936)).

[15] The Court also cited *Gotcher v. City of Farmersville*, 151 S.W.2d 565, 566 (Tex. 1941), and *Taylor*, 490 S.W.2d at 194, but not to support its description of the three categories of liability for nuisance. *See Likes*, 962 S.W.2d at 503–04.

[16] *See, e.g.*, *Mathis v. Barnes*, 377 S.W.3d 926, 930 (Tex. App.—Tyler 2012, no pet.); *Pool v. River Bend Ranch, LLC*, 346 S.W.3d 853, 857 (Tex. App.—Tyler 2011, pet. denied); *Hanson Aggregates W., Inc. v. Ford*, 338 S.W.3d 39, 41 (Tex. App.—Austin 2011, pet. struck); *Lethu Inc. v. City of Houston*, 23 S.W.3d 482, 489 (Tex. App.—Houston [1st Dist.] 2000, pet. denied); *Cain v. Rust Indus. Cleaning Servs., Inc.*, 969 S.W.2d 464, 470 (Tex. App.—Texarkana 1998, pet. denied), *abrogated on other grounds by Envtl. Processing Sys., L.C. v. FPL Farming Ltd.*, 457 S.W.3d 414 (Tex. 2015).

*id.* § 92, at 630, and thus "the courts have seldom made the distinction," *id.* § 88, at 597. Prosser reasoned that in cases in which the plaintiff seeks damages (as opposed to an injunction), "the grounds of liability tend to merge, and the creation of the risk may be called intentional, negligent, or abnormally dangerous activity, according to taste." *Id.* § 88, at 597 n.52. This is so because liability under all three categories ultimately rests on whether the conduct created a nuisance, and that determination requires a balancing of interests under a reasonableness test. *Id.* § 88, at 602.

When Keeton took over the commentary, however, he abandoned the three-category approach because "the utilization of the same label ['nuisance'] to describe all these types of actionable conduct brings about much confusion regarding when the conduct is actionable and what the defenses to such conduct should be." PROSSER AND KEETON § 87, at 623. Keeton observed that the Restatements' efforts "to label all actionable conduct interfering with the use and enjoyment of land as a nuisance" had "produced much confusion and some erroneous results." *Id.* § 91, at 652. He reasoned that nuisance law is designed to protect a wide variety of "distinct individual interests" that

> are not protected in the same way from all kinds of conduct, and the effort to include all kinds of interferences with interests in land as either trespass or nuisance has not been helpful.[17] Trespass and nuisance are terms that should describe intentional

---

[17] Keeton's joint reference to "trespass" and "nuisance" in this quote reflects the law's prior tendency to attempt to force all claims that allege an interference with an interest in land into one or the other of these theories. To add to the confusion that we seek to reduce today, the distinction between a trespass and a nuisance is itself "complex and troublesome." HARPER § 1.23, at 102. This Court recently referred in passing to trespass claims as those that involve a physical entry onto real property, as distinguished from nuisance claims in which the entry onto real property is "not physical." *Gilbert Wheeler, Inc.*, 449 S.W.3d at 480. While that description has some support in the common law, *see* HARPER § 1.23, at 102, and was sufficient for purposes of addressing the difference between temporary and permanent injuries in that case, the distinction is actually more complicated. Most early cases sought to distinguish between a trespass and a nuisance based on whether the intrusion or interference was a "direct" or "indirect" result of the defendant's conduct. *See* HARPER § 1.23, at 100; PROSSER, 3d ed. § 90, at 614–15. Today, the more generally accepted distinction is that a trespass involves interference with the plaintiffs' right to *exclusive possession* of their land, while a nuisance involves interference with the plaintiffs' right to *the use and enjoyment* of their land. *See* HARPER § 1.23, at 102; PROSSER AND KEETON § 87, at 622. When a defendant's conduct interferes with both, the

27

torts, i.e., torts arising out of intentional invasions. A source of much confusion has resulted from the notion that if liability is imposed on those who act reasonably in intentionally interfering with others, then such liability is a kind of liability without fault. It is not; rather, it is liability for harm caused by an intentional invasion; and it may be no justification for not paying for the harm caused that the defendant inflicted the harm reasonably in his own interest or that of the general public.

PROSSER AND KEETON, § 91, at 652–53.

In light of this observation, Keeton concluded that the term "nuisance" should be used only to describe an *intentional* interference or invasion because plaintiffs who allege negligent interferences and invasions can simply assert traditional ordinary-negligence claims. *Id.* Because he believed that combining and overlapping claims based on intentional and negligent conduct under the "nuisance" label provides no benefit to the law or the parties and instead creates only additional questions, he concluded that "it seems highly desirable to limit nuisance to intentional interferences if confusion is to be avoided." PROSSER AND KEETON § 87, at 62. Other commentators have expressed similar sentiments. *See* DOBBS § 400, at 633 ("To put it bluntly, a nuisance claim based on negligence is merely a negligence claim with harm to interests in use and enjoyment."); HARPER §§ 1.23, at 102 (although "negligence is one way in which a nuisance may be caused, . . . where that is the case there is no distinction—the two coalesce"), 1.24, at 109 ("To the extent that one fails to take reasonable precautions to minimize the harmful effects of one's activity, there is a case of common negligence.").

We are sympathetic to these concerns and do not quibble with Keeton's reasoning. To say that a "nuisance" may be created intentionally, negligently, or regardless of fault is to say only that fault is not the relevant inquiry at all. But we are not convinced that Keeton's proposed solution—

---

plaintiffs may assert either claim, or both. HARPER § 1.23, at 103; PROSSER AND KEETON § 87, at 622; *see also* PROSSER, 3d ed. § 90, at 615.

limiting the term "nuisance" to refer only to intentional interferences with the use and enjoyment of land—is workable in light of our precedent or would do much to reduce confusion if it were. In the same way that a claim alleging a negligently created nuisance could be characterized simply as a traditional ordinary-negligence claim in which the legal injury involves interference with the use and enjoyment of land, a claim alleging an intentionally created nuisance could be characterized as a traditional intentional-tort claim involving the same type of legal injury. In either case, the law recognizes both the nuisance as a legal injury and the conduct as a basis for imposing liability for causing that injury. Deciding whether to use the term "nuisance" in connection with one, the other, or both is merely a matter of semantics. *See* HARPER § 1.23, at 101 ("In such situations[,] familiar principles of tort law will account for liability without any special regard to the peculiarities of nuisance.").

We think the better approach to reduce confusion is to clarify, as we do today, that the term "nuisance" refers not to a cause of action or to a defendant's conduct but to the legal injury that the conduct causes and that gives rise to the cause of action. *See* RESTATEMENT (SECOND) OF TORTS § 822 cmt. b ("Failure to recognize that private nuisance has reference to the interest invaded and not to the type of conduct that subjects the actor to liability has led to confusion."). Whether a defendant may be held liable for causing a nuisance depends on the culpability of the defendant's conduct, in addition to proof that the interference is a nuisance.

The authorities are consistently clear that there must be some level of culpability on behalf of the defendant; nuisance cannot be premised on a mere accidental interference. *See* RESTATEMENT (SECOND) OF TORTS § 822 cmt. b ("[A]n actor is no[t] liable for accidental interferences with the use and enjoyment of land but only for such interferences as are intentional

29

and unreasonable or result from negligent, reckless or abnormally dangerous conduct."); *id.* § 822 cmt. c ("Liability for an invasion of interests in the use and enjoyment of land . . . depends upon the presence of some type of tortious conduct."); HARPER § 12.1, at 130 ("[The fault principle] represents the notion that it is fair to make the actor compensate his victim where the actor is at fault, but not where he is innocent of wrongdoing."). We thus retain the three general categories of conduct that may support liability for creating a nuisance, and provide the following additional descriptions of those categories.

### 1. Intentional Nuisance

We first confirm that a defendant may be held liable for intentionally causing a nuisance based on proof that he intentionally created or maintained a condition that substantially interferes with the claimant's use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities attempting to use and enjoy it. "Intent" in this context, as in most legal contexts, means that "the actor desires to cause [the] consequences of his act, or that he believes that the consequences are substantially certain to result from it." *Reed Tool Co. v. Copelin*, 689 S.W.2d 404, 406 (Tex. 1985) (quoting RESTATEMENT (SECOND) OF TORTS § 8A). So a defendant intentionally causes a nuisance if the defendant "acts for the purpose of causing" the interference or "knows that [the interference] is resulting or is substantially certain to result" from the defendant's conduct. RESTATEMENT (SECOND) OF TORTS § 825.

Thus, a plaintiff may establish intent with proof that the defendant acted with a "specific intent to inflict injury," *Reed Tool*, 689 S.W.2d at 406, or a "malicious desire to so harm" by causing the actionable interference, PROSSER AND KEETON § 87, at 624; *see* HARPER § 1.24, at 109. But an intent to inflict injury or desire to do harm is not required to show intent; the plaintiff

30

can establish intent with evidence that the defendant acted with the belief that the interference was "substantially certain to result from" the defendant's conduct. *Reed Tool*, 689 S.W.2d at 406; *see* PROSSER AND KEETON § 87, at 624 (explaining that the defendant acted intentionally if the defendant "created or continued the condition causing the interference with full knowledge that the harm to the plaintiff's interests are occurring or are substantially certain to follow"); HARPER § 1.24, at 109 (explaining that intent is established when the defendant "knows [the harm] is resulting or is substantially certain to result from his conduct"); *see also* RESTATEMENT (SECOND) OF TORTS § 825 cmt. c. (stating that an intentional invasion may be "an invasion that the actor knowingly causes in the pursuit of a laudable enterprise without any desire to cause harm").

Intent is thus measured by a subjective standard, meaning the defendant must have actually desired or intended to create the interference or must have actually known or believed that the interference would result. DOBBS § 29, at 75 ("Since intent is a state of mind, it is necessarily subjective."). It is not enough, in other words, that the defendant should have known that the interference would result because a reasonable person in the same or similar circumstances would have known that it would. In such circumstances, the defendant will have negligently caused the interference, but cannot be said to have intentionally caused it. *See* RESTATEMENT (SECOND) OF TORTS § 8A cmt. b.

However, to prove an intentional nuisance, the evidence must establish that the defendant intentionally caused the interference that constitutes the nuisance, not just that the defendant intentionally engaged in the conduct that caused the interference. *Reed Tool*, 689 S.W.2d at 406 (explaining that intent exists if the actor desires to cause the "consequences" of his act, or knows that the "consequences" are substantially certain to result). Thus, for example, if a defendant

31

intentionally opens a valve with the desire to release contaminants onto the plaintiff's property or with the belief that the release onto the plaintiff's property is substantially certain to result, the defendant intentionally causes any resulting nuisance. On the other hand, if the defendant intentionally opens the valve but does not desire to release the contaminants onto the plaintiff's property and does not know or believe that the release is substantially certain to result, the defendant (although possibly liable for negligent nuisance) does not intentionally cause a nuisance, even though he intentionally opens the valve.

But to be clear, a defendant who acts with the desire to create an interference or with knowledge that the interference is substantially certain to result is liable for intentionally causing the interference even if the defendant does not agree that the interference is substantial or that the effects on the plaintiffs are unreasonable. Thus, if the defendant intentionally opens the valve with the desire to release the contaminants onto the plaintiffs' property or with knowledge that the release is substantially certain to occur, but the defendant does not agree that the resulting interference with the plaintiffs' use and enjoyment of their land is substantial or its effects on the plaintiffs unreasonable, the defendant nevertheless intentionally creates the resulting nuisance. *See* PROSSER AND KEETON § 87, at 625 ("It has often been observed that liability, if imposed in such a case, is liability without fault. But this is a mistake. The harm is intentional.").

Finally, to establish an intentional nuisance, the plaintiff need not separately establish that the defendant's conduct was also "unreasonable." On first blush, the Restatement may appear to suggest the contrary by proposing that a defendant "is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is . . . *intentional and unreasonable*." RESTATEMENT (SECOND)

32

OF TORTS § 822 (emphasis added); *see also id.* § 826 (describing test for determining when an "intentional invasion of another's interest in the use and enjoyment of land is unreasonable"). But the Restatement characterizes a nuisance as an "invasion" of the plaintiff's legal "interest" in the "use and enjoyment of land," and it is this "invasion"—not the defendant's conduct—that must be intentional and unreasonable. *Id.* § 822; *see id.* § 822 cmt. a (distinguishing the "invasion" from the "conduct" that serves as the basis for liability). As the Restatement clarifies in comment b, the use of the term "invasion" refers to the ultimate interference with the use and enjoyment, not to the defendant's conduct. *Id.* § 822 cmt. b (explaining that defendants can be liable "only for such *interferences* . . . as are intentional and unreasonable or result from negligent, reckless or abnormally dangerous conduct" (emphasis added)).

By contrast, Texas precedent, which we confirm today, characterizes a nuisance not as an "invasion" of an "interest" but as a "condition that substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities attempting to use and enjoy it." *Holubec*, 111 S.W.3d at 37; *see also Justiss*, 397 S.W.3d at 153 (citing *Schneider*, 147 S.W.3d at 269) (same); *Barnes*, 353 S.W.3d at 763 (quoting *Schneider*, 147 S.W.3d at 269) (same); *Schneider*, 147 S.W.3d at 269 (quoting *Holubec*, 111 S.W.3d at 37) (same). In essence, whereas the Restatement conceptualizes conduct that causes an invasion that interferes with use and enjoyment, Texas law refers more simply to conduct that causes the interference. In either case, the requirement for an intentional nuisance is that the effects of the substantial interference be unreasonable (thus, that there be a nuisance), not that the defendant's conduct be unreasonable.

## 2. Negligent Nuisance

As discussed, Keeton and others have suggested that the term "nuisance" should not be used at all in connection with a claim alleging that the defendant negligently caused a condition that interferes with the use and enjoyment of property. *See, e.g.*, PROSSER AND KEETON § 87, at 624 ("[I]t seems highly desirable to limit nuisance to intentional interferences if confusion is to be avoided."). We disagree, not only because we doubt that approach is workable, but also because the term "nuisance" is appropriate so long as it is used to refer solely to the alleged legal injury. Operating with this understanding of the term's meaning, we have no difficulty concluding that a defendant can be liable for "negligently" causing a "nuisance."

In this category, the claim is governed by ordinary negligence principles. The elements the plaintiff must prove are "the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach." *IHS Cedars Treatment Ctr., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004). To establish the breach, the plaintiff must prove that the defendant's conduct constituted negligence, which is "simply doing or failing to do what a person of ordinary prudence in the same or similar circumstances would have not done or done." *Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 753 (Tex. 1998). That is, a nuisance may result from "a failure to take precautions against a risk apparent to a reasonable man." PROSSER 3d ed. §88, at 596; *see id.* ("[N]egligence is the usual basis of liability where the defendant . . . has only failed to . . . repair or abate a condition . . . which is under his control."). The only unique element, which derives from the nature of the legal injury on which the plaintiff bases the claim, is the burden to

prove that the defendant's negligent conduct caused a nuisance, which in turn resulted in the plaintiff's damages.[18]

### 3. Strict-liability nuisance

The third category of nuisance-based claims to which the Court referred in *Likes* includes those based on "other conduct, culpable because abnormal and out of place in its surroundings, that invades another's interests." *Likes*, 962 S.W.2d at 503. As support for this category, the *Likes* Court quoted Prosser's assertion that a nuisance "may be inflicted by conduct . . . which involves an unusual hazard or risk, in line with the principle of *Rylands v. Fletcher*." *Id.* at 504 (quoting *Nuisance Without Fault* at 418). Prosser expanded on this category in his earlier commentary, explaining that, even in the absence of intent or negligence, "a nuisance may arise where the defendant carries on in an inappropriate place an abnormally dangerous activity [that] necessarily involves so great a risk to its surroundings that its location may be considered unreasonable, and a strict liability may be imposed." PROSSER, 3d ed. § 88, at 596–97.

This theory derives from the early English court's decision in *Rylands v. Fletcher*, L.R. 1 Ex. 265 (1866), *aff'd*, L.R. 3 H.L. 330 (1868), in which the court held that a defendant who stored large volumes of water in a reservoir on his land was strictly liable for damage that resulted when the water escaped, "however skilfully and carefully the accumulation was made," because the otherwise-unrestrained water was a "dangerous substance." *See Turner v. Big Lake Oil Co.*, 96 S.W.2d 221, 222 (1936) (discussing *Rylands*). As Prosser has explained, however, *Rylands* was a

---

[18] Here, the Gardiners asserted a claim for ordinary negligence in addition to a claim for negligent nuisance, but the trial court granted a directed verdict on the ordinary-negligence claim. Although the Gardiners have not challenged that ruling, we note generally that the claims would be duplicative when the only alleged legal injury is a nuisance.

common-law, strict-liability case, not necessarily a nuisance case, and the "attempted distinction between nuisance and strict liability for abnormal activities . . . has plagued the English as well as the American courts." PROSSER, 3d ed. § 88, at 595; *see also* HARPER §§ 1.23, at 107, 1.24, at 112–13 (critiquing the Restatement's efforts to address strict-liability nuisance and suggesting that such liability should attach only for "abnormally dangerous" activities).

This Court's efforts to address the *Rylands* strict-liability theory, in both nuisance and non-nuisance cases, illustrate the confusion that Prosser described. In *Oakes*, for example, the Court cited *Rylands* for the proposition that one "who for his own purposes brings on his lands and collects and keeps there anything likely to do mischief . . . must keep it in at his peril" and is liable if the thing "escape[s]." *Oakes*, 58 S.W. at 1000. But the Court questioned whether the *Rylands* rule is "a just one" and refused to apply it to a defendant who planted grass that spread through a neighbor's land. *Id.* In the Court's view, the fact that the rule, "as abstractly stated [in *Rylands*], cannot be justly applied to all subjects which its terms embrace, is enough to show that it is incorrect as a statement of a general principle of law." *Id.* The Court noted that the rule "has not met with general acceptance in this country," and "most of the authorities hold[] that liability for [a nuisance] must be based upon negligence or other culpability on the part of the person sought to be held responsible." *Id.*

In *Turner*, the Court again addressed the *Rylands* rule when considering whether a non-negligent landowner could be strictly liable "for the destruction or injury to property occasioned by the escape of salt water from ponds constructed and used by them in the operation of their oil wells." 96 S.W.2d at 221. Concluding that the landowner was not liable in the absence of negligence, the Court noted that American courts had expressed "differing views as to the

36

correctness or applicability" of the *Rylands* rule, and that the Court had "long since repudiated" the basis of the *Rylands* rule in *Oakes*. *Id.* at 222. But confusingly, the Court then distinguished other cases, on which the plaintiffs relied to support their argument that they could recover even in the absence of negligence, on the ground that those cases were "nuisance cases, where the undisputed facts showed an actionable nuisance." *Id.* at 226.

In *Wales Trucking*, the Court acknowledged a "substantial body of law which says that a nuisance may arise where the defendant carries on an abnormally dangerous activity, or where he conducts, on his property, an enterprise such as a carbon black plant, a stockyard, or slaughterhouse." 474 S.W.2d at 186. The Court noted, however, that "Prosser observes that most of those cases . . . have been in equity and concerned the question of future damage, 'so that the question is not really the nature of the defendant's original conduct but whether he shall be permitted to continue it.'" *Id.* at 187 (quoting *Nuisance Without Fault* at 418).

Ultimately, under the *Rylands* rule, the justification for imposing strict liability for abnormally dangerous activities is "the high degree of risk of injury caused by legitimate but dangerous activity." HARPER § 1.24, at 121. Strict liability, in other words, "is based on the idea that [the] defendant was engaged in some kind of activity exposing others to a risk of harm from an accidental invasion under circumstances that justify allocating certain losses from such risk to the defendant, even though the defendant acted with reasonable care." PROSSER AND KEETON § 91, at 653. Whether that justification applies to a claim asserting a nuisance depends not on the nature of the interference as much as on the nature of the risk the defendant's conduct creates.

As these cases illustrate, Texas jurisprudence on claims for strict liability under the *Rylands* rule is unclear, particularly when the plaintiffs allege a nuisance as the legal injury. Here, however,

we need only note that, to the extent that a claim exists in Texas based on a nuisance created by "abnormal and out of place" conduct, it arises only out of conduct that constitutes an "abnormally dangerous activity" or involves an abnormally "dangerous substance" that creates a "high degree of risk" of serious injury. *Turner*, 96 S.W.2d at 222; *Wales Trucking*, 474 S.W.2d at 186; HARPER § 1.24, at 121; *see also* PROSSER, 3d ed. § 88, at 595 (classifying the "abnormal and out of place in its surroundings" theory "within the principle of strict liability").[19] In other words, the mere fact that the defendant's use of its land is "abnormal and out of place in its surroundings" will not support a claim alleging a nuisance; instead, in the absence of evidence that the defendant intentionally or negligently caused the nuisance, the abnormal and out-of-place conduct must be abnormally "dangerous" conduct that creates a high degree of risk of serious injury.

## D. Question of Fact

Finally, with regard to liability for causing a nuisance, we briefly note that the questions of whether an interference with the use and enjoyment of property is substantial, whether the effects of such an interference on the plaintiffs are unreasonable, whether the defendant intentionally or negligently created the interference, and whether the interference results from abnormally dangerous activities generally present questions of fact for the jury to decide. *See Justiss*, 397 S.W.3d at 155 ("The point at which an odor moves from unpleasant to insufferable or when noise grows from annoying to intolerable 'might be difficult to ascertain, but the practical judgment of an intelligent jury [is] equal to the task.'" (quoting *Merrill v. Taylor*, 10 S.W. 532, 534 (Tex.

_____

[19] The First Restatement uses the term "ultrahazardous conduct" where the Second Restatement employs "abnormally dangerous conditions or activities." *Compare* RESTATEMENT (FIRST) OF TORTS § 822, *with* RESTATEMENT (SECOND) OF TORTS § 822. "The choice between the labels 'ultra hazardous' and 'abnormally dangerous' is not too important . . . ." PROSSER AND KEETON § 78, at 555–56. "The point is that certain conditions and activities may be so hazardous to another or to the public generally and of such relative infrequent occurrence to justify allocating the risk of loss to the enterpriser engaging in such conduct as a cost of doing business." *Id.* at 556.

1888))); *Vestal*, 235 S.W.2d at 442 (holding that the plaintiff has the burden "to plead and prove and secure a jury finding that the use of the . . . property . . . was unreasonable"); *Comminge*, 13 S.W. at 558 (approving jury charge because "the average Texas jury would understand" that the interference must injure the plaintiff's legal rights); *Allen*, 34 Tex. at 232 (stating that "the facts must be left to a jury to determine the question" of whether the defendant created a nuisance). A court may decide the issues as a matter of law only if the underlying facts are undisputed or, in light of all the evidence, "reasonable minds cannot differ." *See, e.g.*, *Hernandez v. Tokai Corp.*, 2 S.W.3d 251, 261 (Tex. 1999) (addressing product-liability claims).

## III.
## Private-Nuisance Remedies

As we are endeavoring here to provide more comprehensive guidance on the law of private nuisance in Texas, we briefly mention the remedies available against one who is liable for causing a nuisance. It is well-settled that three different remedies are potentially available to a claimant who prevails on a private-nuisance claim: damages, injunctive relief, and self-help abatement. *See Storey*, 226 S.W.2d at 617; DOBBS § 403, at 644; HARPER § 1.29, at 144; PROSSER AND KEETON § 89, at 637. However, not all remedies are available in every case.

Unlike the determination of whether a nuisance occurred, the decision to enjoin the defendant's conduct or use is "a discretionary decision for the judge after the case has been tried and the jury discharged." *Schneider*, 147 S.W.3d at 286 (citing *State v. Tex. Pet Foods, Inc.*, 591 S.W.2d 800, 803 (Tex. 1979)). A court "may decide to abate a nuisance whether it is temporary or permanent, and may choose not to abate either even if that is the only remedy requested." *Id.* at

39

286–87 (citing *Rainey v. Red River T. & S. Ry. Co.*, 89 S.W. 768, 772 (Tex. 1905)).[20] When an injunction or abatement is inappropriate, the claimant may recover damages. *See* DOBBS § 404, at 645 ("Courts may weigh the good against the harm and conclude that the injunction should be refused but that the defendant must nevertheless pay the plaintiff's damages."). Generally, when "a nuisance is temporary, the landowner may recover only lost use and enjoyment . . . that has already accrued. Conversely, if a nuisance is permanent, the owner may recover lost market value—a figure that reflects all losses from the injury, including lost rents expected in the future." *Schneider*, 147 S.W.3d at 276; *see id.* at 272 (defining temporary and permanent nuisances); *Gilbert Wheeler*, 449 S.W.3d at 480 (defining temporary and permanent in the context of injury to land).

When the nuisance is temporary, the claimant may recover "only such damages as have accrued up to the institution of the suit or (under our system) to the trial of the action." *Baugh v. Tex. & N.O.R. Co.*, 15 S.W. 587, 587–88 (Tex. 1891). Such damages are calculated as loss of rental value, *Schneider*, 147 S.W.3d at 276, or use value, HARPER § 1.30, at 144–45; PROSSER AND KEETON § 89, at 638; PROSSER 3d ed. § 91, at 623, or possibly the cost of restoring the land, DOBBS

---

[20] We note that the analysis of whether to grant injunctive relief against a private nuisance differs from the determination of whether such a nuisance exists, particularly in that it requires the court to consider whether the defendant's conduct or land usage is reasonable. *See City of Temple v. Mitchell*, 180 S.W.2d 959, 961 (Tex. Civ. App.—Austin 1944, no writ) ("The issue here turns upon the question whether the use to which the City's property was devoted was a reasonable one, or, as sometimes expressed synonymously, a justifiable one. This issue does not depend upon whether the use constituted an *abatable* nuisance; which embraces other questions not here involved."); PROSSER AND KEETON § 88A, at 631 ("When the plaintiff wishes to have an activity enjoined on the theory of nuisance, it is necessary to show that defendant's conduct in carrying on the activity at the place and at the time the injunction is sought is unreasonable. Thus, the issue is quite different from that as to entitlement of damages."); *see also* RESTATEMENT (SECOND) OF TORTS § 822 cmt. d (noting that "liability for damages should be treated independently" from relief by injunction). The Gardiners did not seek an injunction against Crosstex, so we need not address that remedy in detail here.

§ 404, at 647.[21] When the nuisance is permanent, the claimant may recover lost market value. *Schneider*, 147 S.W.3d at 276; *Justiss*, 397 S.W.3d at 155. The value "should be ascertained at the date of trial, and it should be the market value of the property for any use to which it might be appropriated." *Sherman Gas*, 123 S.W. at 121. That is, "the jury is permitted to consider all of the uses to which the property is reasonably adaptable and for which it is, or in all reasonable probability will become, available within the foreseeable future." *State v. Windham*, 837 S.W.2d 73, 77 (Tex. 1992) (citing *City of Austin v. Cannizzo*, 267 S.W.2d 808, 815 (Tex. 1954)). However, a jury may not consider "purely speculative uses." *Cannizzo*, 267 S.W.2d at 814.

"In the willing seller-willing buyer test of market value it is frequently said that all factors should be considered which would reasonably be given weight in negotiations between a seller and a buyer." *Id.* (citing 29 C.J.S., *Eminent Domain*, § 159 (1992)). Holding land as an investment is a legitimate use of land and a theory of market value that a jury may consider. *See Hous. Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 828 n.8 (Tex. 2014) (noting testimony that highest and best use of ranch was "rural recreational and hold for future investment"); *In re State*, 355 S.W.3d 611, 617 (Tex. 2011) (holding that the State was allowed to present evidence that the highest and best use of condemned land was "to hold as investment for future development"); *County of Bexar v. Santikos*, 144 S.W.3d 455, 458 (Tex. 2004) (noting expert testimony that land tract's "highest and best use was to hold it as an investment until population and traffic grew to support development for retail use").

---

[21] As we noted in *Likes*, there is also "considerable authority" "for the proposition that a nuisance which impairs the comfortable enjoyment of real property may give rise to damages for 'annoyance and discomfiture.'" 962 S.W.2d at 504 (listing cases). Here, because the Gardiners did not seek damages for annoyance and discomfiture, no issues on such damages are before us. So we do not decide the scope of these damages or determine if they are available for either temporary nuisance, permanent nuisance, or both.

The presumed highest and best use of land is that of its existing use. *Enbridge Pipelines (E. Tex.) L.P. v. Avinger Timber, LLC*, 386 S.W.3d 256, 264 (Tex. 2012). But ultimately the highest and best use of land is a fact question for the jury. *See Windham*, 837 S.W.2d at 77 ("If Windham is permitted to present evidence of the market value . . . on its theory of the highest and best use of the property, then the State should be allowed to present evidence based on its competing theory of the highest and best use of the property. It is then for the jury to decide which evidence to accept and which to reject in deciding the ultimate issue of market value."). Expert testimony may aid the factfinder, but a landowner is also competent to testify to the value of his property if he is familiar with its fair market value. *See Justiss*, 397 S.W.3d at 155.

The general calculation for determining the loss of market value is "the difference in the reasonable market value of the property immediately before and immediately after the injury." *Downs*, 367 S.W.2d at 161. However, when the damage results from an ongoing condition rather than a single event that results in a permanent nuisance, courts apply a "more flexible" rule. *Robinson Mach. Co. v. Davis*, 689 S.W.2d 286, 288 (Tex. App.—Waco 1985, writ ref'd n.r.e.) (noting that "the courts have recognized a more flexible rule" when damage to property is "the result of a continuing cause"); s*ee Sherman Gas*, 123 S.W. at 121 ("The trial judge instructed the jury to ascertain the value of the property for the purpose to which plaintiffs had dedicated it, just before, and such value, just after, the construction and operation of the plant. The charge was error upon a vital issue in the case."); *Burns v. Lamb*, 312 S.W.2d 730, 734 (Tex. Civ. App.—Fort Worth 1958, writ ref'd n.r.e.) ("Ordinarily, recovery for damage to property is the difference between its market value immediately before and immediately after the catastrophe causing the damage. But since in this case there was no isolated event to which all the damage could be attributed, such a

test would be manifestly inadequate."). The proper comparison in those circumstances is "of market value with and without the nuisance." *Justiss*, 397 S.W.3d at 155.

## IV.
## Sufficiency of the Evidence

We now turn to the arguments and evidence in this case. Generally, Crosstex argues that the court of appeals erred in holding that the evidence was legally sufficient to support the jury's finding that it negligently created a nuisance, while the Gardiners argue that the court applied the wrong standard of review when it determined that the evidence was factually insufficient to support that finding. Crosstex also challenges the court's holding that the trial court erred by denying the Gardiners a trial amendment to assert an "abnormal and out of place in its surroundings" claim, and its failure to address Crosstex's challenge to the jury's damages findings.

### A. Evidence of Nuisance

We begin by addressing the evidence in light of the definition of a nuisance we have confirmed today. Jury Question No. 2, which addressed the Gardiners' negligent-nuisance claim, asked, "Did Crosstex negligently create a nuisance as to the [Gardiners' property]?" With this question, the court instructed the jury by using the definition of "nuisance" we have approved today: "A 'nuisance' is a condition that substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities." To that question, the jury answered, "Yes."

Setting aside the question of whether sufficient evidence supports a finding that Crosstex engaged in legally culpable *conduct*, it is apparent from that definition and the jury's answer to Question 2 that the jury necessarily found that Crosstex created the kind of substantial *interference* and unreasonable *effects* that constitute a nuisance. We conclude that legally sufficient evidence

43

supports that finding. The Gardiners presented evidence that the noise from the motors was extremely loud, caused vibrations across their land, and substantially interfered with their ability to enjoy their land. Crosstex's evidence that it had installed "hospital-grade" mufflers, hired sound engineers to conduct noise readings, hung sound-absorbing blankets inside the building, built three sound walls around on the south side of the building and another sound wall on the east side, and installed air-intake silencers may be evidence to the contrary, but it does not negate the Gardiners' evidence. In fact, it may tend to support the finding that Crosstex created, and then repeatedly sought to mitigate, a nuisance. We therefore agree with the court of appeals that the Gardiners presented legally sufficient evidence of the type of substantial and unreasonable interference that constitutes a nuisance.

## B. Evidence of Negligence

Along with the definition of "nuisance," Question No. 2 also included an instruction that:

A party "negligently" creates a nuisance if they fail to use ordinary care, that is, fail to do that which a person or party of ordinary prudence would have done under the same or similar circumstances or doing that which a person or party of ordinary prudence would not have done under the same or similar circumstances. "Ordinary care" means the degree of care that would be used by a person or party of ordinary prudence under the same or similar circumstances.

Crosstex maintains that the evidence is legally insufficient to support a finding that Crosstex breached the negligence standard of care, and thus no evidence supports the jury's "Yes" answer to Question No. 2. Conversely, the Gardiners contend that the court of appeals erred by applying the wrong standards when it concluded that the evidence was factually insufficient to support the jury's findings.

## 1. Legal sufficiency

Evidence is legally insufficient to support a jury finding when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 362–63 (1960). When determining whether legally sufficient evidence supports a finding, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). The evidence is legally sufficient if it constitutes more than a "scintilla" of evidence on which a reasonable juror could find the fact to be true. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002); *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996).

After providing an extended and detailed description of the evidence, the court of appeals concluded here that legally sufficient evidence supports the jury's finding that Crosstex acted negligently because, "[b]ased on the evidence set out above, the jury could have found that . . . during the four years since the compressor station had started operating, Crosstex had failed to use ordinary care, failed to do that which a person or party of ordinary prudence would have done under the same or similar circumstances, or did that which a person or party of ordinary prudence would not have done under the same or similar circumstances." 451 S.W.3d at 174. At the end of

this sentence, the court added a footnote stating, "That is, the record reflects that there was no specific line item budgeted for sound mitigation when the station was approved but [Crosstex's director of Texas operations] said that all compressor stations are noisy." *Id.* at 174 n.34.

Focusing on the footnote, Crosstex first argues that the court erred by finding evidence of negligence by imposing "a new duty" on pipeline operators to budget line-item expenses for sound mitigation. Crosstex contends that this "new duty" will have far-reaching implications on the Texas economy, that the court imposed the duty without conducting a proper legal analysis, and that the court provided no guidance on how operators can satisfy the duty. The Gardiners dispute that the court imposed any "new duty" on Crosstex, and contend instead that the court referred to the absence of a budget for mitigation expenses as merely one example of the evidence that Crosstex failed to act reasonably when it constructed the compressor station. We agree with the Gardiners that nothing in the court's footnote or the text of its opinion suggests that the court considered it a discrete legal "duty" to budget for mitigation expenses. To the contrary, the court specifically and correctly identified the negligence duty as the duty to use "ordinary care" and to act as a "party of ordinary prudence" would have acted "under the same or similar circumstances." *Id.* at 174.

Next, Crosstex argues that the Gardiners failed to submit any evidence of the negligence standard of care applicable to a pipeline operator that constructs and operates a compressor station. According to Crosstex, the Gardiners were required to provide testimony or other evidence of how a "similarly-situated natural gas pipeline operator of ordinary prudence would act in constructing and operating a compressor station near rural property used only for agricultural purposes."

Crosstex further maintains that establishing such a "specialized" standard of care requires expert testimony. We disagree.

The duty that Crosstex owed to the Gardiners was the duty to do what a person of ordinary prudence in the same or similar circumstances would have done. *See Timberwalk Apartments*, 972 S.W.2d at 753; *see also Elliff v. Texon Drilling Co.*, 210 S.W.2d 558, 563 (Tex. 1948) ("In the conduct of one's business or in the use and exploitation of one's property, the law imposes upon all persons the duty to exercise ordinary care to avoid injury or damage to the property of others."); *Rhodes v. Whitehead*, 27 Tex. 304, 307 (1863) ("The great principle which seems to control all the modern cases is, that men must so use their own as not to injure the rights of others, or to incommode others; they must not endanger health or comfort, or produce inconvenience, and there can be no prescriptive right in a nuisance."). We agree with the Gardiners that the jury did not need expert testimony to understand that duty. *See GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 620 (Tex. 1999) ("Where, as here, the issue involves only general knowledge and experience rather than expertise, it is within the province of the jury to decide, and admission of expert testimony on the issue is error."). The breach of that duty was building and continuing to operate the compressor station in such a way that its noise was beyond reasonable levels. The evidence of that breach included testimony that the noise was louder than even Crosstex anticipated, that the mitigation efforts Crosstex implemented did not lessen the noisome interference, and that Crosstex could have taken other steps to mitigate the noise but chose not to because of cost considerations. We agree with the court of appeals that some evidence supports the jury's finding that Crosstex acted negligently in creating the condition that the jury found to constitute a nuisance.

Relying on *Vestal*, Crosstex next argues that the Gardiners were required to prove and secure a jury finding that Crosstex's use of its property was unreasonable. *See Vestal*, 235 S.W.2d at 442 ("[T]he burden rested on the [plaintiffs] to . . . secure a jury finding that the use of the . . . property by the respondent was unreasonable."). As discussed above, we did not hold in *Vestal* that a plaintiff who seeks to recover for a negligently-created nuisance must prove both that the defendant negligently created the nuisance and that the defendant's use of its land was unreasonable. In a claim alleging a negligently created nuisance, the jury must find both that the effects on the plaintiffs of the interference with their use and enjoyment of land were unreasonable (and thus, the condition causing the interference qualifies as a nuisance), and that the defendant's conduct that created the condition was unreasonable (and thus the defendant negligently created the nuisance), but it need not separately find that the defendant's use of its land was unreasonable. As the court of appeals correctly noted, "the elements of negligent nuisance do not include unreasonable use" of land, at least not as an element separate from the requirement that the defendant acted negligently. 451 S.W.3d at 155 n.2.

We conclude that the trial court here properly asked the jury to find whether Crosstex negligently created a nuisance and properly defined both "nuisance" and "negligence" for the jury. And for the reasons explained, we agree with the court of appeals that the Gardiners presented some evidence, and therefore legally sufficient evidence, to support the jury's answer.[22]

---

[22] Our holding that there is some evidence supporting the jury's finding of negligent nuisance should not be construed as rejecting as a matter of law that Crosstex could not have been found liable for intentional nuisance. As Dobbs explained, "Although there is no overlap between intent and negligence, it is sometimes difficult to discern whether a given set of conduct falls in one category or another." DOBBS § 31, at 77. Here, while there is no evidence that Crosstex desired to create the interference with the Gardiner's use and enjoyment of their land, there is at least some evidence that Crosstex activated the compressor station and continued to operate it with knowledge that the interference was occurring or was substantially certain to occur. When the evidence "may permit the trier to draw different inferences, so that some jurors would conclude that a defendant acted intentionally while others would

48

## 2. Factual sufficiency

Although the court of appeals found the evidence legally sufficient to support the jury's negligent-nuisance finding, it then concluded that the evidence was factually insufficient, and it therefore remanded the cause to the trial court for a new trial. 451 S.W.3d at 174, 179. In their cross-petition, the Gardiners complain that in concluding that the evidence was factually insufficient, the court of appeals failed to conduct the proper analysis as required under *Pool v. Ford Motor Co.*, 715 S.W.2d 629 (Tex. 1986). While this Court has no jurisdiction to review the evidence for factual sufficiency, we can review whether the court of appeals properly conducted that analysis. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (citing *Pool*, 715 S.W.2d at 634–35).

The court of appeals announced the correct standard: When reviewing an assertion that the evidence is factually insufficient to support a finding, a court of appeals sets aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, it determines that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. 451 S.W. 3d at 154–55 (citing *Pool*, 715 S.W.2d at 635; *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965)). And the appeals court acknowledged that when it reverses for factual insufficiency, it must detail the relevant evidence and clearly state why the evidence is factually insufficient. *Id.* at 174–75.

---

conclude that he acted only negligently," both theories could be submitted to the jury so that it may determine what inferences may reasonably be drawn. *Id.* § 31, at 77–78.

For sixteen pages of its opinion, the court of appeals recited the evidence the jury heard in this case. *Id.* at 158–74. It then noted specific facts that it believed outweighed any evidence that Crosstex acted negligently in constructing and operating the compressor station:

- "When Crosstex received complaints that the compressor station's noise was too loud for the area, it held a meeting with the area landowners, consulted with a sound expert, and began implementing mitigation efforts based on his recommendations." *Id.* at 176.

- "Crosstex installed sound walls around the fans instead of the perimeter, but there was no testimony that this decision was negligent and that such walls around the perimeter instead of around the fans would have made a difference in mitigating the noise." *Id.*

- "There was no testimony that the compressor station itself was operated negligently or that the mitigation itself—mufflers, building, sound blankets, sound walls, and air intake silencers—had been negligently installed." *Id.*

- "The record reflects that Crosstex relied on its expert's recommendations, and nothing shows that such reliance was negligent under the circumstances." *Id.*

- "[N]o one testified about how long such mitigation efforts would normally take or whether Crosstex's efforts took too long, whether any technologies other than a fully enclosed building existed to reduce the noise, and whether a fully enclosed building would have been quieter by the time Crosstex had installed other mitigation measures." *Id.*

- "Crosstex continued to invest in additional sound mitigation to try to remedy the problem despite the Gardiners' complaints that none of its efforts made a difference." *Id.*

After detailing the evidence and highlighting these facts, the court concluded that the evidence was "factually insufficient to support the jury's negligent nuisance finding." *Id.*

The dissenting justice took issue with the court of appeals' majority's brief conclusion, stating:

The Majority Opinion wholly fails to articulate how, or in what respect, the evidence supporting the jury's finding to question number 2 is so weak that the

50

> finding is clearly wrong or manifestly unjust or to explain how the jury's "yes" finding to question number 2 is so against the great weight and preponderance of the evidence that it is clearly wrong or manifestly unjust and fails to defer to the jury's determinations as to the weight and credibility of the witnesses; instead, the Majority Opinion substitutes its own view of the evidence for that of the jury.

*Id.* at 181–82 (WALKER, J., dissenting). The dissent further complained that the majority "cherry-pick[ed] isolated snippets of evidence or testimony" and "substitute[d] its own credibility determinations . . . despite extensive, directly-conflicting evidence that the jury below found persuasive." *Id.*

Although the court of appeals' opinion may not be a model of clarity, we cannot say that the court did not consider and weigh all the evidence when half of its opinion was devoted to laboriously detailing that evidence. Further, although the court did not include a summary statement expressly explaining that the evidence was factually insufficient "because" of particular reasons, its opinion makes clear its conclusion that the jury's finding was "contrary to the overwhelming weight" of the evidence that Crosstex relied on expert advice, responded to neighbors' complaints, and continually took a series of steps to mitigate the noise from the station's engines. We conclude that the court's opinion adequately describes its reasoning as *Pool* requires, and we have no jurisdiction to evaluate that reasoning. We therefore affirm the court of appeals' judgment remanding the case for a new trial.

## C. "Abnormally Dangerous" Conduct

We do not, however, affirm the court of appeals' holding that the trial court abused its discretion by denying the Gardiners' request for a trial amendment. 451 S.W.3d at 179. At the jury charge conference, the Gardiners requested a jury question asking, "Was Crosstex's conduct abnormal and out of place in its surroundings such as to create a nuisance as to the Gardiners?"

51

Crosstex objected, arguing that the Gardiners never pleaded such a theory. The trial court refused the question on that ground. The Gardiners then requested a trial amendment to add an allegation that "Crosstex's conduct was abnormal and out of place in its surroundings," which the trial court denied. The court of appeals held that the trial court abused its discretion by refusing the trial amendment because "the entire case was based on the Gardiners' underlying grievance that the compressor station's noise was abnormal and out-of-place in its surroundings." 451 S.W.3d at 177; *see Greenhalgh v. Serv. Lloyds Ins. Co.*, 787 S.W.2d 938, 939 (Tex. 1990) (stating that a trial court has no discretion to refuse a trial amendment unless (1) the opposing party presents evidence of surprise or prejudice, or (2) the amendment asserts a new cause of action or defense and thus is prejudicial on its face, and the opposing party objects to the amendment).

As we have confirmed today, however, this strict-liability basis for a claim alleging a nuisance must be based on conduct that constitutes an "abnormally dangerous activity," and not just an activity that is "abnormal and out of place in its surroundings." *See Turner*, 96 S.W.2d at 222; *Wales Trucking*, 474 S.W.2d at 186. On the record as it currently exists in this case, we find no evidence that the compressor station was abnormally dangerous or that Crosstex engaged in the type of abnormally dangerous or ultrahazardous conduct that would support such a cause of action. We thus conclude that the trial court properly denied the Gardiners' request for a trial amendment to assert that claim.

**D. Damages**

Because the Court's judgment remands the case for a new trial, we need not and do not address Crosstex's additional arguments regarding the sufficiency of the evidence supporting the

jury's damages award. The parties and trial court on remand, however, should find sufficient guidance on those issues in today's opinion.

## VI.
## Conclusion

Given the long and storied history of nuisance law, it is not surprising that the courts and parties in this case have struggled to articulate the elements of the Gardiners' nuisance claim. Even the most esteemed tort commentators do not agree. We hold today that the term "nuisance" describes a particular legal injury involving interference with the use and enjoyment of property but does not describe a cause of action; that a defendant can be liable for intentionally or negligently causing a condition that constitutes a nuisance; and that neither claim requires a separate finding that the defendant unreasonably used its property when creating a nuisance.

The parties and the trial court did not have the benefit of today's decision at the time of trial. Because today's decision provides clarification of the law, we affirm the court of appeals' judgment remanding the case to the trial court for a new trial, to be governed by the principles we announce today. *See Bacon v. Gen. Devices, Inc.*, 830 S.W.2d 106, 107 (Tex. 1992) (per curiam) (remanding to court of appeals so that it may "have the opportunity to reconsider [its] rulings in light of" this Court's intervening opinion); *Welex, a Div. of Halliburton Co. v. Broom*, 816 S.W.2d 340, 340 (Tex. 1991) (per curiam) (same); *see also In re Doe 2*, 19 S.W.3d 278, 283 (Tex. 2000) (applying Texas Rule of Appellate Procedure 60.2(f) to remand case to the trial court, instead of the appellate court, for a new hearing).

_____
Jeffrey S. Boyd
Justice

53

Opinion delivered: June 24, 2016