

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| CHRISTOPHER J. NELSON, Individually and d/b/a EXCLUSIVE POOLS, | § | No. 08-21-00068-CV |
| | § | |
| Appellant, | § | Appeal from the |
| | § | 125th Judicial District Court |
| v. | § | |
| | § | of Harris County, Texas |
| BKM DEVELOPMENT, LP, | § | |
| | § | (TC# 2015-38993) |
| Appellee. | § | |

## MEMORANDUM OPINION

This case arises from a pool remodel gone bad. Appellee BKM Development, LP (BKM) sued Appellant Christopher J. Nelson and his company, Exclusive Pools, over renovation to BKM's swimming pool after local authorities closed the pool following a failed inspection. Based on a bench trial, the trial court found for BKM and ordered Nelson to pay actual damages and attorney's fees. Nelson appeals the trial court's judgment, arguing that the evidence is factually insufficient to support: (1) Nelson's material breach of the construction contract; and (2) the trial court's award of actual damages. For the following reasons, we affirm.[1]

---

[1] This case was transferred from our sister court in Houston (14th District), and we decide it in accordance with the precedent of that court to the extent required by TEX.R.APP.P. 41.3.

# I. BACKGROUND

## A. Factual Background

BKM is a real-estate limited partnership that holds and manages commercial properties. Adam Kliebert is its agent who had the authority to enter contracts on behalf of BKM. In May 2015, Kliebert hired Nelson and his company, Exclusive Pools, to renovate an existing pool at one of BKM's properties. The pool was located between a Montessori school operated by Kliebert's mother and a nightclub Kliebert owned and operated. The pool was used by the children at the school during the summer. Kliebert wanted to remodel the pool so that it could also be used for the nightclub. Kliebert's vision was to construct a ledge to subdivide the existing pool into two pools, one of which would be very shallow. Nelson, who told Kliebert that he was a professional who had worked on thousands of pools, provided Kliebert with several price estimates for the pool remodel.

The parties dispute which estimate the remodeling agreement was based on. According to Kliebert, the initial estimate stated a total cost of $56,185 (Plaintiff's Exhibit 4), but Kliebert and Nelson negotiated for an ultimate contract price of $49,415 (Plaintiff's Exhibit 5). BKM also presented a third estimate from Nelson (Plaintiff's Exhibit 6) that yielded a total contract price of $51,685. As we explain below, this latter estimate formed the basis for the trial court's award of actual damages. Under all these estimates, Nelson would: (1) excavate dirt from the pool; (2) reinstall rebar and a add a gunite sun shelf; (3) add new lighting, tile, coping, decking, and a holding tank; (4) relocate pool equipment; (5) add new decking overlay and repair cracks on the existing decking; and (6) resurface the pool with white marble plaster. The estimate also included a payment schedule based on Nelson's completion of specific tasks.

2

Problems arose during the construction process. BKM introduced a series of text messages detailing repeated issues with the pool's construction and operation, as well as Kliebert's repeated attempts to have Nelson rectify the issues. These text messages alluded to (1) the shallow end improperly filling with water; (2) the lighting and coping not being completed; (3) the construction falling behind schedule; (4) Nelson's unapproved modifications of the contract's provisions; and (4) a crooked step in the pool. Kliebert also testified that the pool did not function properly as the water level in one pool was too low while the other overflowed.

The pool remodel was never completed. Nelson testified that he stopped doing work on the pool in late May 2015. In June, the City of Houston inspected the pool and ordered it shut because it did not meet the City's code requirements. The City issued an "Aquatic Facility Inspection Report," which required the pool to remain closed until Kliebert submitted plans for the pool remodel, the plans were approved, and the pool passed inspection. Kliebert's proposed plans were ultimately rejected by the City. The parties also disagreed about whose responsibility it was to get the permits for the pool remodel. Kliebert asserted that Nelson told him that he did not need permits for the project because he was only remodeling the pool. Nelson, however, claimed that Kliebert asked him not to acquire permits because Kliebert had an overall building permit that would cover the pool remodel.

The parties also disputed what payments BKM made to Nelson. Kliebert testified that he made all but the last two payments on the payment schedule. At one point in his testimony, he made that claim while referring to Plaintiff's Exhibit 5 (the $49,415 invoice) and at another point, he repeated the claim while referring to Plaintiff's Exhibit 6 (the $51,685 invoice). Kliebert specifically recalled paying three of the invoices that Nelson provided, including the down payment for the remodel, the gunite and light conduit, and tile and coping. Nelson acknowledged

3

that he received three checks from Kliebert, but claimed that he did not have a record of the total amount that he received from Kliebert. At trial, neither party sought to admit copies of any actual checks showing payments.

In June 2015, Nelson filed a mechanic's and materialman's lien against the property. By this time, BKM was considering selling the property. BKM had to pay the amount of the lien ($8,183) to obtain a lien release to sell the property.

## B. Procedural Background

BKM sued Nelson alleging breach of contract, breach of warranty, and violations of the Texas Deceptive Trade Practices Act. It sought to recover the amount that it paid for the pool remodel that was never completed, money lost because of the incomplete pool remodel, attorney's fees, court costs, and interest. At trial, Nelson argued that there was no evidence of an agreement or contract between the parties. His other position was that BKM paid Nelson nothing and consequently was not entitled to recover anything. Following a bench trial, the trial court rendered judgment for BKM and awarded the company $38,763.75 in actual damages, attorney's fees of $19,250, along with interest, court costs, and conditional appellate attorney's fees. Nelson filed a request for findings of fact and conclusions of law and a notice of past due findings and conclusions; no findings or conclusions are in our record.[2]

On appeal, Nelson argues that the trial court's judgment is not supported by factually sufficient evidence. Specifically, Nelson argues that the trial court erred in deciding that Nelson breached any contract with BKM because none of BKM's complaints evidence a "material breach." Nelson further argues that the trial court's actual damages award is unsupported by

---

[2] Although Nelson points out that the trial court did not enter findings of fact or conclusions of law in response to his request, he does not argue that the trial court erred by doing so.

4

factually sufficient evidence because BKM did not prove the applicable measure of damages and failed to prove that the damages sought were reasonable.

## II. STANDARD OF REVIEW

When the trial court does not make express findings of fact, we imply that the trial court made all findings necessary to support its judgment, provided that: (1) the necessary findings are raised by the pleadings and supported by the evidence; and (2) the decision can be sustained by any reasonable theory consistent with the evidence and applicable law. *See Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990). The trial court's findings of fact, express or implied, are reviewable for factual sufficiency by the same standards applied in reviewing the evidence supporting a jury's answer. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). Our standard of review is clear: "When reviewing an assertion that the evidence is factually insufficient to support a finding, a court of appeals sets aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, it determines that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered." *Crosstex N. Texas Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 615 (Tex. 2016). Stated otherwise, a reviewing court should only reverse a verdict if it is so against the great weight and preponderance of the evidence as to be manifestly unjust, or if the result shocks the conscience or clearly demonstrates bias. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). "Under a factual-sufficiency review, the reviewing court must not substitute its judgment for that of the fact finder, who 'is the sole judge of the credibility of witnesses and the weight to be given to their testimony.'" *Matter of Estate of Masters*, No. 08-20-00156-CV, 2022 WL 2827022, at *3 (Tex.App.--El Paso July 20, 2022, no pet.), *quoting Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

## III. MATERIAL BREACH

### A. Applicable Law

A breach of contract claim requires proof of four elements: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff from the breach. *Houle v. Casillas*, 594 S.W.3d 524, 556 (Tex.App.--El Paso 2019, no pet.). When one party to a contract commits a material breach of the contract, the other party is discharged or excused from further performance. *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 196 (Tex. 2004) (per curiam). By contrast, a nonmaterial breach entitles the other party to sue for damages caused by the breach but does not excuse future performance. *Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436 (Tex. 2017). So, the question in cases like ours is often which party breached the contract first, and whether the first breach was material. *Mustang Pipeline*, 134 S.W.2d at 200. To answer the materiality questions, a trier considers these factors: "(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of the circumstances including any reasonable assurances; (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing." *Id.* at 199, *citing* Restatement (Second) of Contracts § 241 (1981).

6

## B. Analysis

The parties dispute who first committed a material breach. Nelson argues that there is factually insufficient evidence that he materially breached the contract, which means BKM breached first by failing to pay the full amount it owed under the contract. If true, that excused Nelson's full performance of his obligations. BKM counters that Nelson was the first party to materially breach the contract by failing to ensure that the pool remodel resulted in a functioning pool and failing to obtain proper construction permits from the City. We consider the evidence against each *Mustang Pipeline* factor in turn.

### 1. BKM's failure to receive the benefit under the contract

Nelson argues that BKM suffered only two deprivations caused by the lack of Nelson's full performance: (1) a two-week delay in completing the work and a five-day delay in submitting plans for a permit; and (2) an additional $3,825.52 in costs for additional parts and work. Although Nelson claims that the work would have been delayed by five days due to his failure to submit work plans to the City, the record suggests that Nelson never submitted any plans to the City. Kliebert was then required to submit his own plans. Nelson also told Kliebert that work permits from the City were unnecessary, which along with a failed inspection, caused the City to shut down construction and close the pool and render it useless either for the Montessori school or the nightclub.

And while Nelson claims that BKM was only deprived of $3,825.52 in additional costs for unanticipated parts and labor, an obvious third benefit that BKM was deprived of was the lack of a functioning, usable pool. Kliebert testified that the pool constantly overflowed because the pool lacked sufficient pumping. Half of the pool would then lack sufficient water and become unusable. Along with Nelson's failure to get proper permits, the deficient construction caused the City to

7

shut the pool down and forced BKM to purchase a $20,000 temporary pool for use by the Montessori students.

In sum, the record contains evidence that Nelson's substandard work caused the pool to contain insufficient water for swimming and it failed inspection by the City. The pool was unusable for its intended purpose. Because BKM failed to receive the benefit of the contract, this factor favors Nelson's material breach.

### 2. BKM's compensation for the deprived benefit

Because Nelson did not adequately remodel the pool or acquire a work permit, the pool was rendered unusable and was shut down by the City. This required BKM to hire others to draft permit plans for the City and complete the pool remodel, and to purchase a temporary swimming pool for the Montessori students. BKM eventually built another pool at a different location, which cost around $100,000. Thus, this factor also weighs in BKM's favor.

### 3. Nelson's forfeiture

Nelson argues that he had started or completed most of the work associated with the contract. Although we agree that Nelson started a significant portion of the work, as explained above the evidence also shows that there were significant problems with the quality of the construction.

### 4. Likelihood of Nelson's curative measures

A series of text messages between Kliebert and Nelson showed that Kliebert tried to have Nelson correct the deficiencies in the pool until at least June 8, 2015. At some point in June, Nelson stopped coming to the worksite or performing any construction, and on July 15, 2015, he placed a lien on BKM's property. Nelson then accepted BKM's payment of the lien amount in exchange

for releasing the lien. Thus, the record contains evidence that Nelson was unlikely to engage in curative measures to remedy the issue with the pool.

### 5. *Nelson's good faith and fair dealing*

The evidence shows that despite being paid thousands of dollars, Nelson failed to remodel the pool in a manner that rendered it fit for its intended purpose, did not acquire proper permits for the work, and eventually abandoned the project after repeated issues with construction arose. Moreover, Nelson's filing of a lien against BKM's property when Kliebert stopped making payments is evidence that Nelson did not intend to complete his obligations under the contract despite his deficient performance. This factor favors BKM.

### 6. *Substantial performance*

Weaved into his argument, Nelson also contends that he substantially performed under the contract, thereby excusing his breach. The "doctrine of substantial performance" is an equitable doctrine adopted to allow a contractor who has substantially completed a construction contract to sue on the contract rather than being relegated to a cause of action for quantum meruit. *Turner v. Ewing*, 625 S.W.3d 510, 518 (Tex.App.--Houston [14th Dist.] 2020, pet. denied). "The doctrine of substantial performance recognizes that the contractor has not completed construction, and therefore is in breach of the contract" but "the owner cannot use the contractor's failure to complete the work as an excuse for non-payment." *Id.* at 518. "In a substantial performance claim, the contractor must prove three elements to prevail: its substantial performance, the amount unpaid under the contract, and 'the cost of remedying the defects due to his errors or omissions.'" *Id.*, quoting *Vance v. My Apartment Steak House of San Antonio, Inc.*, 677 S.W.2d 480, 483 (Tex. 1984).

But for much the same reasons already noted, the record does not support Nelson's claim of substantial performance. Instead, the evidence showed that the pool was practically unusable for its intended purpose due to Nelson's failure to properly remodel the pool. Kliebert testified that the pool frequently overflowed, the lighting and other components were incorrectly installed, and the pumps had to be repeatedly shut down. These issues were confirmed in text messages between Kliebert and Nelson. The City shut down the pool indefinitely after Nelson failed to obtain permits and the pool failed inspection. Because Nelson's substandard performance significantly impaired the purpose of the pool remodel, the doctrine of substantial performance does not apply to excuse Nelson's breach. *See James Constr. Grp., LLC v. Westlake Chem. Corp.*, 650 S.W.3d 392, 406 (Tex. 2022) (recognizing that a party will not be excused from contractual duties if the party's performance severely impairs the purpose of underlying contract and causes prejudice to the nonbreaching party).

In sum, the bulk of the *Mustang Pipeline* factors support a finding that Nelson first committed material breaches of the contract by failing to adequately construct the pool or acquire proper permits. Thus, factually sufficient evidence supports the trial court's implied finding that Nelson was the first party to have materially breached the contract. Nelson's Issue One is overruled.

## IV. ACTUAL DAMAGES

Nelson also argues that the trial court's actual damages award is not supported by factually sufficient evidence.[3] In particular, Nelson contends that BKM failed to offer evidence establishing

---

[3] We review a factual sufficiency challenge to an award of damages under the same test for any other factual sufficiency question. *See DeNucci v. Matthews*, 463 S.W.3d 200, 214 (Tex.App.--Austin 2015, no pet.).

the cost of correcting the deficient work on the pool, or the difference in value between the work performed and the worth of the work if it had complied with the terms of the contract.

BKM could have pursued three measures of damage for breach of contract: expectancy, reliance, or restitution. *Atrium Med. Ctr., LP v. Houston Red C LLC*, 595 S.W.3d 188, 193 (Tex. 2020). "Expectancy damages award a contract plaintiff the benefit of its bargain; reliance damages compensate the plaintiff for out-of-pocket expenses; and restitution damages restore to the plaintiff a benefit that it had conferred on the defendant." *Id.* The trial court appears to have based the damages on an out-of-pocket measure, which is "the difference between the value the buyer has paid and the value of what he has received." *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex. 1997). That is, the trial court calculated the value of what BKM received minus what it paid to Nelson.

BKM contends it received nothing of value as it never obtained a functional pool. And absent approval from the City, the pool was closed and unusable. There is sufficient evidence that BKM received nothing of value. The question we focus on is what BKM paid to Nelson. In closing argument, BKM contended that its evidence demonstrated its payment of approximately $37,000 "and change" to Nelson under the contract. This was supported by Kliebert's testimony that he made all but the last two of the six payments on the payment schedule for Plaintiff's Exhibit 5 (the estimate and payment schedule for $49,415). The first four payments under Plaintiff's Exhibit 5 total $37,061.25. But at a later point in Kliebert's testimony, he referred to Plaintiff's Exhibit 6 the document that he paid from. The trial court awarded $38,763.75 which would exactly match the first four payments from Plaintiff's Exhibit 6 (the $51,685 estimate and payment schedule).[4] At

---

[4] The first four payments on the payment schedule were broken down this way: (1) twenty percent on the first day of work in the amount of $10,337; (2) fifteen percent upon completion of gunite and lighting in the amount of $7,752;

trial, Nelson acknowledged that Kliebert paid him three checks under the contract, but he did not recall the total amount of the checks. Nelson also acknowledged that he received money from BKM to release the lien for $8,183, but he still argued that the only evidence of BKM's payment was for $9,883, which was shown as being "Paid to Date" on an invoice.

So while the evidence conflicts, the trial court as the fact finder based its finding on the latter testimony of Kliebert, which it had a right to do. We conclude that the evidence is factually sufficient to support the $38,763.75 damage finding.

Nelson's Issue Two is overruled.

## V. CONCLUSION

We affirm the judgment below.

JEFF ALLEY, Justice

November 8, 2022

Before Rodriguez, C.J., Palafox, and Alley, JJ.

---

(3) twenty percent upon completion of cantilever and tile in the amount of $10,337; and (4) twenty percent upon completion of plaster in the amount of $10,337.